**DAVENPORT GROUP MG, L.P., Plaintiff,**

v.

**STRATEGIC INVESTMENT PARTNERS, INC., et al., Defendants.**

**C.A. No. 14426.**

Court of Chancery of Delaware, New Castle County.

Submitted: Oct. 11, 1995.
Decided: Jan. 23, 1996.

Michael Hanrahan, Elizabeth M. McGeever and April Caso Ishak of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington; Robert K. Ciulla, Lewis Segal and William S. Fish, Jr. of Tyler Cooper & Alcorn, Hartford, Connecticut, of counsel, for Plaintiff.

Thomas R. Hunt, Jr. and William M. Lafferty of Morris, Nichols, Arsht & Tunnell, Wilmington; John B. Nolan, Steven M. Greenspan, Jeffrey G. Grody and Daniel L. Schwartz of Day, Berry & Howard, Hartford, Connecticut, of counsel, for Certain Defendants.

STEELE, Vice Chancellor.

## CONTENTIONS OF PARTIES

Plaintiff, Davenport Group MG, L.P. ("Davenport" or "the General Partner"), is the general partner of Madison Group, L.P. ("Madison" or "the Limited Partnership"), a Delaware Limited Partnership. Plaintiff brought this action seeking a declaration Davenport "has the right to be the General Partner of Madison...." Davenport also asks the Court to invalidate the purported vote of the Limited Partners removing the General Partner because the Limited Partners of Madison have no legal basis to remove the General Partner.

Defendants, Strategic Investment Partners, Inc., et al., deny Plaintiff's allegations they improperly removed the General Partner. Defendants are those Limited Partners of Madison who have consented in writing to the removal of Davenport as the General Partner of Madison. Defendants ask this Court to dismiss the complaint, to declare the Limited Partners validly removed Davenport as the General Partner of Madison, and to grant any further relief this Court deems just and proper.

## FACTUAL BACKGROUND

The parties filed extensive briefs reciting their respective proposed findings of fact. I find it unnecessary to address the facts other than those related to the allegations Madison breached the Limited Partnership Agreement by condoning the Management Company's use of transaction fees to award salaries and bonuses to its employees. These payments predated Defendants' actions to remove Davenport as General Partner.

The General and Limited Partners formed Madison in late 1990. Davenport Group GP, Inc. ("GP, Inc.") is the General Partner of Davenport. They intended to create a fund to invest in securities of privately owned companies. The General Partner and Limited Partners committed to contributions totaling $120,345,000.

Five individuals—Robert B. Milligan, Jr. ("Milligan"), Timothy W. Carroll ("Carroll"), Michael D. Lincoln ("Lincoln"), Scott B. Fabricant ("Fabricant"), and John E. Mullen, III ("Mullen")[1]—raised funds for Madison. All five became employees of the management company, Davenport Management, Inc. ("the Management Company"). They were responsible for investing Madison's capital and overseeing the investments.[2] They per-

1. The Management Company terminated Mullen's employment in 1994.

2. Defendants allege Olof Nelson was also a member of the Management Company. For purposes of this opinion, it is of no moment whether he was or not. The Management Company, which Davenport hired to perform certain administrative duties, inappropriately used transaction fees to pay salaries and bonuses to a "generic" group of Management Company employees. As long as

formed this work as employees of the Management Company pursuant to a service agreement ("the Service Agreement") between Madison and the Management Company. They also served as officers and directors of the Management Company as well as of GP, Inc.

During its initial organization, the fledgling partnership created the First Amended and Restated Limited Partnership Agreement ("the Limited Partnership Agreement") to govern the affairs and the rights and duties of its General Partner and Limited Partners. The General Partner, Limited Partner, and Special Partner signed the Limited Partnership Agreement.

The Management Company had two sources of income: (1) quarterly management fees Madison paid for its investment banking and accounting services and (2) the transaction fees it earned from Madison's investment process in other companies.

Section 3(b) of the Service Agreement enumerated specific purposes for which the Management Company must use the management fees:

The Management Company *will* pay for its expenses, including the following expenses out of the quarterly management fee provided for in Section 3(a): (i) all normal operating expenses related to rental of office space and utility and telephone service, office equipment and personnel (*including salaries and bonuses,* payroll taxes, costs of employee benefit plans and temporary help expense), (ii) all routine administrative expenses, including, without limitation, maintenance of the Partnership's books and records, ownership, leasing and operation of automobiles for management personnel, travel and entertainment and other similar routine administrative expenses, and (iii) fees to members of the Advisory Board.

The Partnership will pay, or will reimburse the General Partner of the Partnership, the Management Company and their affiliates for reasonable and necessary amounts paid by any of them on behalf of the Partnership, for all other expenses of the Partnership including but not limited to, (i) expenses of organizing the Partnership as set forth in Section 6.01(c)(ii) of the Limited Partnership Agreement and of qualifying the Partnership under applicable federal and state securities laws and other applicable laws; (ii) legal, accounting and auditing fees, appraisal costs, consulting fees and custodian fees, costs of judgments or settlements in connection with litigation, and fines or penalties levied in connection with investigations or proceedings; (iii) expenses of indemnity as provided in Article XIII of the Limited Partnership Agreement and reasonable insurance in respect thereof; (iv) brokerage commissions, transfer taxes and finders' fees; (v) normal and customary project and investee company related expenses, other than expenses enumerated in Section 3(c) hereof or similar in nature thereto; (vi) all expenses incurred in connection with the liquidation, dissolution and winding up of the Partnership as provided in Section 11.02(a)(i) of the Limited Partnership Agreement; (vii) expenses of the members of the Conflict of Interest Committee and (viii) all other Partnership operating and other expenses. (emphasis added).

The Service Agreement also included language in Section 3(e) which governed the disposition of the transaction fees:

Notwithstanding any other provision of this Agreement, and except as provided in Section 3(b) hereof, the Management Company shall not distribute or otherwise pay any cash or property attributable to fees earned by the Management Company pursuant to Section 3(c) hereof to any of its stockholders, directors, officers or employees, except as may be required for the purpose of making additional capital contributions to the Partnership, for the purpose of paying fees to Conning & Company as the placement agent for the Partnership or for the purpose of enabling stockholders of the Management Company to pay taxes with respect to the income of the Manage-

---

the Management Company used transaction fees to pay even one person who the parties agree was a Management Company employee, a breach of contract occurred. In fact, Plaintiff and Defendants concede no less than five employees received the payments in question.

ment Company, until such time as the General Partner is entitled to receive any distribution pursuant to Section 4.01 of the Limited Partnership Agreement.

Between 1991 and 1993, The Management Company received nearly $12,000,000 in transaction fees from the companies in which Madison invested.

When the Parties organized Madison, they deliberated over the tax treatment of these transaction fees. Originally, the Limited Partners were to receive 50 percent of the transaction fees.[3] In the final version of the Limited Partnership Agreement, the Management Company would receive all transaction fees. Those fees, however, were not distributable for any purposes not enumerated in Section 3(e) above until the General Partner became entitled to a distribution under Section 4.01 of the Limited Partnership Agreement. The Limited Partnership Agreement specifically identifies "the Management Company" as Davenport Management, Inc. in ˙Section 1.01 *Definitions.* Madison would pay eight percent of newly contributed capital to the Limited Partners. Madison guaranteed these so-called "Guaranteed Payments." Apparently, this arrangement best accommodated the Limited Partners that were tax exempt organizations. The Limited Partnership Agreement obligated Madison to make approximately $9,600,000 (eight percent of committed capital) in Guaranteed Payments.

## CONCLUSIONS OF LAW

### 1. The Management Company Breached the Service Agreement

■ The record indicates the officers and directors of the Management Company used transaction fees to compensate themselves. Davenport allowed the Management Company to use the transaction fees to pay salaries and bonuses to the employees of the Management Company. I am convinced the lan-

guage of the Limited Partnership Agreement and of the Service Agreement unambiguously compelled Davenport, as General Partner, to halt these impermissible pay outs and its failure to do so constitutes a breach of the Limited Partnership Agreement. Section 6.05 of the Limited Partnership Agreement provides a mechanism for the Limited Partners to remove the General Partner for such a breach, and they have acted accordingly. One breach alone justifies action to remove Davenport.[4]

I need not look beyond the face of the Limited Partnership Agreement and of the Service Agreement to construe the appropriate use of transaction fees. An ambiguity exists when the contractual provisions are "reasonably or fairly susceptible" to varying interpretations. *E.I. du Pont de Nemours and Co. v. Admiral Ins. Co.,* Del.Super. C.A. No. 89C–AU–99, Steele, J. (Aug. 23, 1995), Mem. op. at 24, 1995 WL 562256 (*citing Rhone–Poulenc Basic Chems. Co. v. American Motorists Ins. Co.,* Del.Supr., 616 A.2d 1192, 1196 (1992)). Delaware courts will not look to extrinsic evidence to interpret an unambiguous contract. *Id.* (citing *City Investing Co. Liquidating Trust v. Continental Casualty Co.,* Del.Supr., 624 A.2d 1191, 1198 (1993); *Citadel Holding Corp. v. Roven,* Del.Supr., 603 A.2d 818, 822 (1992); *Pellaton v. Bank of N.Y.,* Del.Supr., 592 A.2d 473, 478 (1991)).

I find the language of the Limited Partnership Agreement and Service Agreement clear and unambiguous. A Delaware court should give the terms of the contracts their plain meaning. *See Hallowell v. State Farm Mut. Auto. Ins. Co.,* Del.Supr., 443 A.2d 925, 926 (1982).

### 2. Davenport Breaches The Limited Partnership Agreement by Condoning the Breach of the Service Agreement

Neither the Limited Partnership Agreement nor the Service Agreement authorizes

---

**3.** Plaintiff's Trial Brief reads "... the Employees (and Mullen) proposed that transaction fees would be split between **Plaintiff** and **Madison** on a 50/50 basis." (emphasis added).

   Defendants' Pretrial Brief reads: "The promoters had proposed that the **limited partners** would participate in a 50/50 split with **DMI [The Management Company]** of 'transaction or structuring

fees' received by DMI from Investee Companies." (emphasis added).

**4.** Of course, the Limited Partners must effect the removal according to the specific provisions of the Limited Partnership Agreement. I discuss this issue *infra.*

the Management Company to use transaction fees to pay salaries and bonuses to its stockholders, directors, officers, or employees. Section 6.03(a) of the Limited Partnership Agreement specifically recites, "[t]he Partners, by execution of this Agreement, approve in substance the Service Agreement attached as Exhibit A to this Agreement." Even though there is no express provision in the Limited Partnership Agreement restricting the use of transaction fees, the Management Company's use of transaction fees to pay salaries and bonuses contrary to the terms of the "approve[d]" Service Agreement constitutes a breach of the Limited Partnership Agreement. The Limited Partnership Agreement specifically acknowledges this relationship. The Limited Partnership Agreement incorporates the Service Agreement in text and in its inclusion of the Service Agreement, Exhibit A, as part of the contract.

Moreover, Section 6.01(c) states,

The General Partner, for and on behalf of the Partnership, shall have full power and authority, in addition to such powers and authorities as may be provided by law or elsewhere in this Agreement (through payment of the management fee under the Service Agreement as to items covered by the Service Agreement and otherwise by direct payment or reimbursement): . . .

(iii) to engage and pay such agents, attorneys, accountants, appraisers, custodians, finders, advisers and consultants as they may deem necessary or appropriate for the affairs of the Partnership (including, without limitation, assistance to the General Partner in performing its obligations under Section 12.02); . . .

(xi) to enter into, make and perform the Service Agreement described in Section 6.03; . . .

The express language of Section 3(e) of the Service Agreement enumerates the purposes for which the Management Company may use transaction fees as required:

for the purpose of **making additional capital contributions to the Partnership,** for the purpose of **paying fees to Conning & Company as the placement agent for the Partnership** or for the purpose of **enabling stockholders of the Management Company to pay taxes with respect to the income of the Management Company,** until such time as the General Partner is entitled to receive any distribution pursuant to Section 4.01 of the Limited Partnership Agreement. (emphasis added).

The express language in no way empowers the Management Company to pay salaries or bonuses from the transaction fees, yet the record indicates, that is exactly what the Management Company did.

■ Plaintiff argues the clause in Section 3(e) "except as provided in Section 3(b) hereof" authorized the use of transaction fees to compensate the Management Company's employees. I do not agree. Section 3(b) *specifically* authorizes the use of quarterly management fees—not transaction fees—to pay salaries and bonuses. Section 3(e) creates no exception allowing the use of transaction fees for salaries and bonuses. I must agree with Defendants; the exception in Section 3(e) refers only to the second paragraph of Section 3(b).[5] The Management Company *may* use transaction fees to reimburse expenses it, its affiliates, or the General Partner may incur under the second paragraph of Section 3(b). It does not authorize the use of transaction fees to pay salaries or bonuses to its employees.

### 3. Davenport Breaches The Limited Partnership Agreement by Failing to Discharge its Fiduciary Duty

Section 6.01(a) *Rights, Powers and Duties of the General Partner* reads:

**The General Partner shall have the exclusive management and control of the affairs of the Partnership and shall have the power and authority to do all things necessary and proper to carry out the**

5. The second paragraph of Section 3(e) reads in relevant part:
   The Limited Partnership will pay, or will reimburse the General Partner of the Limited Partnership, the Management Company and their affiliates for reasonable and necessary amounts paid by any of them on behalf of the Limited Partnership, for all other expenses of the Limited Partnership including but not limited to, . . .

**purposes and objectives of the Partnership pursuant to the terms of this Agreement.** (emphasis added).

■ Davenport, by accepting the role as General Partner, under the language of the Limited Partnership Agreement itself, had an obligation to manage Madison in a manner consistent with the common law duties of a fiduciary.

Davenport, as the General Partner, had an obligation to carry out this responsibility to Madison dutifully and in accordance with the Limited Partnership Agreement. It cannot compromise this responsibility, barring a provision in the Limited Partnership Agreement contracting away or modifying that responsibility. *See* The Delaware Revised Uniform Limited Partnership Act, 6 *Del.C.* § 17–1101(d) (1994); *James River–Pennington Inc. v. CRSS Capital, Inc.,* Del.Ch., C.A. No. 13870, Steele, V.C. (Mar. 6, 1995), Mem. op. at 23, 24, 1995 WL 106554. None appears here. In fact, the controlling Limited Partnership Agreement embodies both the duties of care and loyalty in Section 6.01(f). It reads in pertinent part:

> In carrying out its duties and exercising its powers hereunder, the General Partner shall exercise reasonable care and business judgment and shall act at all times in what it deems to be the best interest of the Partnership. In the case of any conflict between the interests of the General Partner and the interests of the Partnership, the General Partner shall not act in a manner which the General Partner believes to be inconsistent with the best interests of the Partnership or inconsistent with this Agreement.

The language of this provision, e.g, "shall," indicates the parties expressly bargained for and accepted the imposition of these duties as an imperative. Davenport accepted this responsibility by agreeing to become the General Partner under these terms.

The Limited Partnership Agreement allows the General Partner to enter into a service agreement—in effect, to assign its administrative management responsibility to a third party. *See* Limited Partnership Agreement, Section 6.01(c). One must assume Davenport hired the Management Company in good faith, in conformity with its general fiduciary duties.

However, in order to fulfill its fiduciary role, Davenport had a duty to monitor its delegation of administrative authority to the Management Company to assure the Management Company acted consistently with the terms of the Service Agreement. If the Management Company's conduct breached the Service Agreement, the General Partner had an obligation to address that conduct. The General Partner could not countenance a violation of the Service Agreement as incorporated into the Limited Partnership Agreement. Even though Davenport delegated its administrative management responsibility, it can neither delegate nor avoid its fiduciary responsibility to assure appropriate administration of the entire understanding of the parties to the Limited Partnership Agreement.

The Management Company had an obligation to administer its delegated powers in accordance with the Service Agreement. It did not. The Management Company's use of transaction fees to pay salaries and bonuses violated the express language of the Service Agreement as "approve[d]" by the parties to the Limited Partnership Agreement. The General Partner (Davenport) delegated administrative management authority to the Management Company which resulted in an application of that administrative authority inconsistent with the terms of the Limited Partnership Agreement and Service Agreement. Davenport cannot insulate itself from its assignee's derogation of duties under the Service Agreement.

Davenport, the General Partner of Madison, breached the Limited Partnership Agreement by permitting the Management Company to use the transaction fees for purposes other than the Service Agreement allowed. The officers and directors of GP, Inc. chose to interpret the Service Agreement in a manner authorizing payments to themselves in their respective roles as employees of the Management Company. They made this decision as officers and directors of GP, Inc., the General Partner of Davenport, the entity responsible for supervising the rela-

tionship of Madison with the Management Company in the best interest of the Limited Partners and Madison.

The gravamen of the General Partner's duty to the Limited Partners and to Madison itself is the obligation of loyalty to the enterprise. This duty, absent contractual modification, parallels that of a corporation's director. *See Cinerama, Inc. v. Technicolor, Inc.*, Del.Ch., C.A. No. 8358, Allen, C. (Jun. 21, 1991, revised Jun. 24, 1991), Mem. Op. at 37, 1991 WL 111134; *Kahn v. Roberts, et. al.*, Del.Ch., C.A. No. 12324, Steele, V.C. (Dec. 6, 1995) Mem. Op. at 10, 1995 WL 745056.

Whether couched as a breach of contract by condoning or approving an act unauthorized by the contract or as a breach of the duty of loyalty of a fiduciary expressly recited in the contract, Davenport's conduct formed an appropriate basis for removing Davenport as the General Partner.

### 4. Propriety of the Limited Partners' Removal of Davenport as the General Partner of Madison

I concluded above Defendants had cause to remove Davenport as General Partner. I further find the Limited Partners properly executed the removal. Under Section 6.05 *Removal of General Partner* of the Limited Partnership Agreement:

> The General Partner may be removed by the written agreement of the Limited Partners representing two-thirds (⅔) or more of the then outstanding aggregate Limited Partner Capital Accounts of the Partnership: (a) if the General Partner has materially breached this Agreement, [sic] (b) if Robert B. Milligan, Jr. or at least two of Timothy W. Carroll, John E. Mullen, III, Michael D. Lincoln and Scott B. Fabricant, cease to be actively involved with the General Partner; (c) in the event of the insolvency, bankruptcy, receivership, dissolution, or assignment of assets for the benefit of creditors of the General Partner or its general partner; (d) in the event that any GP Member is convicted of a felony, whether or not involving or in connection with the Partnership; or (e) in the event that the GP Members as of the Closing Date cease to own in the aggre-

gate at least fifty-one percent (51%) of the common shares of the General Partner's general partner. Nothing in this Section 6.05 shall give the Limited Partners the right to remove the General Partner based solely on the performance of the Partnership's investments....

The record is clear. The Limited Partners conformed with these requirements and properly removed Davenport as General Partner of Madison. The Limited Partnership Agreement required written consents from two-third of the Limited Partners. The record indicates the Limited Partners collected the required percentage of written consents.

#### (a) *The Technical Defects Argument*

■ Plaintiff raises hypertechnical arguments regarding the sufficiency of the writings that are without merit. The minor defects Plaintiff points out in some of the written removal agreements neither undermine the authority used to take the action nor impugn the intent to remove for cause.

Defendants secured new agreements (which this Court admitted into evidence) curing any technical defects which obviate Plaintiff's reliance on technicalities. Two-thirds of the Limited Partners did sign written consents (the written removal agreements) to remove Davenport and they did so because of a breach of the Limited Partnership Agreement. There is no evidence any disgruntled Limited Partner who signed a removal agreement did so under any misapprehension of fact or confusion about the significance or consequences of its action. Plaintiff unconvincingly claims the written removal agreements are not sufficiently specific to render them effective. Section 6.5 does not require the Limited Partners to include explicit language stating "breach of Limited Partnership Agreement." Using the phrase "for cause" easily falls under the penumbra of a breach of the Limited Partnership Agreement. The record indicates the agreements sufficiently reflect Defendants' desire to remove Davenport as General Partner of Madison for breach of the Limited Partnership Agreement.

**(b)** ***The Argument the Limited Partners Based the Written Removal Agreements on Misinformation***

■ Plaintiff challenges the removal because "[t]he Defendant [Limited Partners] [a]cted [b]ased on [m]isinformation and [m]istaken [c]onclusions." Plaintiff alleges Defendants' removal agreements were meaningless because the Limited Partners based their decisions on "material misrepresentations and omissions" stemming from an allegedly inaccurate report regarding Madison that Coopers & Lybrand produced. Plaintiff insists Defendants' reliance on erroneous information in consummating the removal of Davenport as General Partner renders the removal agreements " 'meaningless.' *Weinberger v. UOP*, Del.Supr., 457 A.2d at [sic] 701, 712 (1983); *see also Stroud v. Grace*, Del.Supr., 606 A.2d 75, 86–87 (1992)." In *Weinberger*, directors denied critical information to minority stockholders who, because of this breach of candor, tendered their shares, at less than fair market value, based upon less than all of the information reasonably available and necessary to a fully informed decision to tender. 457 A.2d at 702, 712. As a result, they suffered a $17 million loss. *Id.* at 712. There, the Supreme Court declared **"[u]nder the circumstances,** an approval by a majority of the minority was meaningless." (emphasis added). *Id.* They had accepted the corporation's buy back price ignorant (through no fault of their own) of critical information. *Id.*

Here, even if the allegedly erroneous information did mislead Defendants, it did not constitute the sole basis for the removal. The record indicates Defendants relied on other bases for their decision which Plaintiff does not, and cannot, characterize as misleading, e.g., the General Partner's inaction in the face of the use of transaction fees to pay salaries and bonuses of the Management Company's employees.

Moreover, even if misleading information prompted Defendants' removal of Davenport, time proved their decision to be both correct and properly executed. Their later knowledge of Davenport's violation of the Limited Partnership Agreement vitiates any problems which "misleading" information may have caused initially.

**(c)** ***The Argument the Limited Partners Signed Before Actual Knowledge of a Breach***

■ Although no Delaware case is directly on point, the contention one or more of the Limited Partners signed before actual knowledge of a bona fide breach seems analogous to the "after-acquired evidence doctrine" which federal courts have applied in the employment discrimination setting. *See, e.g., McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995); *Johnson v. Honeywell Info. Sys., Inc.*, 955 F.2d 409 (6th Cir.1992); *Summers v. State Farm Mut. Auto. Ins. Co.*, 864 F.2d 700 (10th Cir.1988), *overruled by McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995); *cf. Wallace v. Dunn Const. Co., Inc.*, 968 F.2d 1174 (11th Cir.1992) (refusing to apply after-acquired evidence doctrine). The after-acquired evidence doctrine allows an employer to introduce evidence the employer collected after the discharged employee brings suit for wrongful discharge. In *McKennon*, the Supreme Court wrote:

> When an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge.

513 U.S. at —— ——, 115 S.Ct. at 886–87. If this later-discovered information evidences proper grounds for discharge, the employer may use it to justify removal of the plaintiff-employee. *Id.*

Similarly, here, even if the Limited Partners discovered the improper use of transaction fees *after* they removed Davenport, they are justified in their removal of Davenport. Davenport sanctioned payments of salaries and bonuses to individuals from a contractually prohibited source to the detriment of the financial interest of the Limited Partnership. "After-acquired" but factually undisputed information alone may support the removal of the General Partner.

Even if Defendants did not rely on the improper use of transaction fees to pay salaries and bonuses at the time they signed the removal agreements, it makes no difference. A breach of the Limited Partnership Agreement had occurred and indeed was ongoing at the time of the removal justifying Defendants' action.

### SUMMARY

I find the Limited Partners properly removed Davenport as General Partner. I deny Plaintiff's request for a declaration Davenport has the right to be the General Partner of the Limited Partnership.

I grant Defendants' counterclaim to dismiss the complaint, and declare the Limited Partners validly removed Davenport as the General Partner of Madison.