# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JOHN C. TATUM III and JCT CAPITAL LLC, | ) ) ) | |
| Plaintiffs and Counterclaim Defendants, | ) ) ) ) | |
| v. | ) ) | C.A. No. 2022-0970-JTL |
| FAIRSTEAD AFFORDABLE LLC, FCM AFFORDABLE LLC, JD2 AFFORDABLE LLC, STUART FELDMAN, JEFFREY GOLDBERG, FSC EF&F LLC, FAIRSTEAD CAPITAL LLC, FAIRSTEAD CAPITAL MANAGEMENT LLC, JD2 REALTY MANAGEMENT LLC, FA DC LLC, FSC REALTY MANAGEMENT LLC, and SDF FUNDING LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants and Counterclaim Plaintiffs. | ) ) | |

## MEMORANDUM OPINION DISMISSING COUNT IV OF THE COUNTERCLAIMS

Date Submitted: November 6, 2023
Date Decided: December 22, 2023

Thomas A. Uebler, Adam J. Waskie, Sarah P. Kaboly, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; *Counsel for John C. Tatum III and JCT Capital LLC.*

Ryan D. Stottman, Thomas P. Will, Alec Hoeschel, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Michael B. Carlinsky, Rollo C. Baker, Jonathan E. Feder, Alison Y. Lo, Cohl K. Love, Stephanie Keleman, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Counsel for Fairstead Affordable LLC, FCM Affordable LLC, JD2 Affordable LLC, Stuart Feldman, Jeffrey Goldberg, FSC EF&F LLC, Fairstead Capital LLC, Fairstead Capital Management LLC, JD2 Realty Management LLC, FA DC LLC, FSC Realty Management LLC, and SDF Funding LLC.*

**LASTER, V.C.**

The defendants comprise an investment fund complex specializing in affordable housing. One of the entities in the fund complex employed plaintiff John C. Tatum, III. The defendants agreed to his departure, deeming it a resignation without good reason.

After Tatum filed this action, the defendants asserted a counterclaim in which they sought to recharacterize his departure as a termination for cause. Doing so would allow them to cancel all of his economic interest in the fund complex for no consideration. Tatum holds those interests through plaintiff JCT Capital LLC, an entity he controls.[1]

Tatum moved to dismiss the counterclaim, contending that the defendants cannot recharacterize his departure. This decision grants that motion. The allegations in the counterclaims demonstrate that the defendants knew about the alleged misconduct on which they now rely before they accepted Tatum's departure as a resignation without good reason. The defendants benefited from that determination, which delayed Tatum's ability to work for another firm. The defendants then waited another eight months before changing course. They cannot now retroactively treat Tatum's departure as a termination for cause.

## I.     FACTUAL BACKGROUND

The facts are drawn from the currently operative pleadings and the documents

---

[1] The distinction between Tatum and his entity is not significant to this decision, which for simplicity refers only to Tatum.

they incorporate by reference. For purposes of the motion to dismiss, the counterclaims' allegations are assumed to be true, and the defendants receive the benefit of all reasonable inferences.[2]

## A. Fairstead

The entity defendants are part of an investment fund complex that operates under the trade name "Fairstead." Defendants Stuart Feldman and Jeffrey Goldberg control Fairstead.

In 2016, Tatum and William Blodgett co-founded Fairstead Affordable LLC with Feldman and Goldberg. They negotiated an operating agreement to govern the internal affairs of Fairstead Affordable. Ex. 1 (the "Operating Agreement"). Tatum became a member of Fairstead with a 5.25% member interest. Tatum also signed an employment agreement with one of the entities in the fund complex. Ex. 4 (the "Employment Agreement").

## B. Fairstead 2.0

By 2020, Blodgett, Tatum, and other Fairstead employees had become unhappy with their compensation and equity ownership. In late 2020, Tatum and Blodgett worked with advisors on strategies for increasing their equity ownership, gaining control of the fund complex, or alternatively starting a competing business. While Tatum and Blodgett were making plans, they continued working for Fairstead.

---

[2] Citations in the form "Ex. ___" refer to documents attached to the amended complaint. Citations in the form "CC ¶ ___" refer to allegations in amended counterclaims.

Tatum's 5.25% member interest in Fairstead vested on May 6, 2021. Three days later, Tatum and Blodgett began downloading thousands of Fairstead documents to their devices. They inferably downloaded those documents in case they decided to start a competing firm.

That same month, Blodgett told Feldman that Fairstead's employees were unhappy with their compensation and intended to leave. During a meeting on May 18, 2021, Blodgett provided Feldman with a term sheet for restructuring Fairstead. Called "Fairstead 2.0," it contemplated that Blodgett, Tatum, and other employees would own 80–90% of the equity. Feldman and Goldberg would own the balance.

Feldman rejected the term sheet and asked Blodgett to identify the employees' concerns. Blodgett never did.

The defendants allege that Blodgett and Tatum timed their proposal to take advantage of Feldman and Goldberg when they were most vulnerable. In May 2021, Fairstead had at least twenty-eight construction projects underway. Feldman and Goldberg had personally guaranteed the financing for those projects. If Tatum and Blodgett left and took Fairstead's employees with them, then Fairstead could default on its loans, making Feldman and Goldberg liable on their guarantees.

Meanwhile, Blodgett and Tatum downloaded more Fairstead documents to their devices. Tatum connected four personal flash drives to a Fairstead computer and copied thousands of documents.

During June 2021, matters became more tense. Tatum met again with Feldman about Fairstead 2.0. Feldman again rejected the proposal and made clear

3

that he and Goldberg would not give up control of Fairstead. Shortly after the meeting, Tatum downloaded additional Fairstead documents, including organization charts, valuation documents, and information about business contacts.

Feldman decided to investigate Tatum and Blodgett's activities. After discovering their suspicious downloading, Fairstead hired a forensic analyst to investigate further. Fairstead also hired outside counsel to oversee an investigation and identify any potential claims against Tatum and Blodgett.

## C. Blodgett And Tatum Leave.

Based on the investigation, Feldman and Goldberg concluded that Tatum and Blodgett had breached their contractual and fiduciary obligations to Fairstead. They caused Fairstead to terminate Blodgett for cause on September 14, 2021. They did not terminate Tatum. According to the counterclaims, they were "concerned that the announced termination of two of [Fairstead's] senior executives could have a negative impact on the business." CC ¶ 78.

Shortly thereafter, Tatum announced his intention to leave Fairstead. He prepared and began implementing a transition plan.

On October 21, 2021, Fairstead's general counsel notified Tatum that by engaging in actions such as transferring his 401(k) account to a new provider, he had constructively resigned. Fairstead's general counsel informed Tatum that Fairstead had accepted his resignation and deemed it a resignation without good reason. Under the Operating Agreement, that meant Tatum had to give 120-days written notice before leaving. Tatum could not work for a competitor during that period without

4

breaching the Operating Agreement. His departure from Fairstead did not become official until February 10, 2022.

## D.     Fairstead And Tatum Negotiate The Terms Of His Departure.

Beginning in October 2021, Tatum and Fairstead negotiated the terms of his departure. Fairstead demanded that Tatum return any confidential or proprietary information in his possession. Fairstead's counsel also stated in various communications that Fairstead was reserving "any and all rights, claims, and recourse it may have against Mr. Tatum, whether arising by or in contract, law, equity, or otherwise." CC ¶ 84.

As early as December 2021, Fairstead made clear to Tatum that he had breached the Employment Agreement and the Operating Agreement. CC ¶ 86. In April 2022, Fairstead's counsel told Tatum in writing that Fairstead had determined that he "engaged in numerous offenses that would easily serve as grounds to have fired [him] for cause." CC ¶ 87. Counsel then reiterated that Fairstead had accepted Tatum's resignation without good reason, while reserving all rights to dispute Tatum's entitlement to compensation. Counsel then proposed to proceed with a buyout process for Tatum's interests in Fairstead Affordable. Fairstead exercised its buyout right, and Fairstead and Tatum subsequently engaged in an appraisal process.

## E.     Fairstead Changes Course.

On June 28, 2022, Fairstead's counsel informed Tatum that although Fairstead previously accepted his resignation without good reason, it had now determined that Tatum had engaged in a scheme to usurp control of Fairstead and

5

steal Fairstead's employees. Fairstead therefore was recharacterizing Tatum's departure as a termination for cause.

Fairstead counsel asserted that Tatum's misconduct began before May 6, 2021, when his member interest in Fairstead Affordable vested. Fairstead contended that it would have fired Tatum for cause before the vesting date if it had known about his misconduct. Fairstead therefore deemed all of Tatum's interests to be forfeited and cancelled them without providing any compensation to Tatum.

## F.    This Litigation

Tatum sued on October 26, 2022. Among other things, he sought an order directing Fairstead to comply with the buyout mechanism in the Operating Agreement. Alternatively, he seeks money damages for breach of those provisions.

The defendants responded with eleven counterclaims. In Count IV, the defendants seek a declaration that they retroactively terminated Tatum for cause. Tatum has moved to dismiss Count IV.

## II.    LEGAL ANALYSIS

Tatum contents that Count IV fails to state a claim on which relief can be granted.

> When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.

*Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

6

Section 8.8(a)(v) of the Operating Agreement provides that if Tatum were terminated for cause before May 6, 2021, he would forfeit 100% of his membership interests. The defendants allege that Tatum engaged in conduct that would have allowed them to terminate him for cause before the vesting date if they had known about it. They further allege that Tatum concealed his misconduct until June 2022.

To support their argument for a retroactive, for-cause termination, the defendants rely on *Metro Storage International LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022). That case involved an executive who engaged in misconduct throughout his employment. The company only discovered the misconduct after the executive had resigned. The company sought to exercise an option to repurchase the executive's equity interests for no consideration, which it could only do after a termination for cause.

The *Metro Storage* decision permitted the company to recharacterize the executive's departure as a termination for cause, reasoning as follows: "Under the 'after-acquired evidence' doctrine, an employer can 'introduce evidence the employer collected after the discharged employee brings suit for wrongful discharge.'" *Id.* at 879 (citing *Davenport Gp. MG, L.P. v. Strategic Inv. P'rs, Inc.*, 685 A.2d 715, 723 (Del. Ch. 1996)). "The doctrine typically applies when an employer uses evidence acquired after an employee's termination to defend against a claim that it wrongfully terminated that employee." *Id.* The doctrine "applies all the more persuasively . . . where a faithless fiduciary [] concealed the wrongdoing that could have supported a for-cause termination." *Id.* As a policy matter, the court noted that unless an

7

employer could invoke the doctrine, a faithless fiduciary could benefit from its acts of deception. *Id.*

The defendants attempt to rely on *Metro Storage*, but the allegations of the counterclaims defeat their claim. Assuming for purposes of analysis that Tatum breached his obligations, the defendants concede that they knew about Tatum's conduct before they accepted Tatum's resignation without good reason. The counterclaims allege that it was "clear" to the defendants "in July 2021" that "Blodgett and Tatum were not acting in good faith to better Fairstead but were, instead, focused on their hostile takeover." CC ¶ 10. The defendants necessarily knew about those activities in May 2021, when Blodgett told Feldman about Fairstead 2.0.

The counterclaims also acknowledge that after conducting an investigation, Fairstead terminated Blodgett for cause in September 2021, citing "material breaches" of his agreements. The same investigation "revealed that Tatum had engaged in misconduct that caused numerous breaches of his legal obligations." *Id.* ¶ 78. According to their own allegations, the defendants had sufficient knowledge to terminate Tatum for cause in September 2021.

The counterclaims further allege that the defendants consciously chose not to terminate Tatum, out of concern for the "negative impact on the business" that could occur if Fairstead announced that two of its senior executives had been terminated. *Id.* Instead, the defendants accepted Tatum's resignation on October 21, 2021, deeming it a resignation without good reason. That allowed Fairstead to insist on

8

120-days written notice, which prevented Tatum from working elsewhere until February 2022.

For the next eight months, the defendants continued to act as if Tatum had resigned without good reason. Fairstead exercised its buyout right, and the parties engaged in an appraisal process. On multiple occasions, the defendants described Tatum as having resigned without good reason and noted that his resignation had been accepted. In April 2022, the defendants told Tatum again that they were aware of breaches of his contractual and fiduciary duties that would have provided grounds for termination for cause. Yet the defendants did not purport to retroactively change the nature of Tatum's termination until June 2022.

Having taken these positions, Fairstead cannot now claim that it did not terminate Tatum for cause because he had concealed his misconduct. The *Metro Storage* case relied on the after-acquired evidence doctrine. It did not countenance a previously acquired evidence doctrine. The employer in *Metro Storage* did not know about the executive's breaches until after he had left, then promptly acted on the information. Fairstead knew about Tatum's alleged misconduct by May 2021, decided not to terminate him for cause, accepted his resignation in September 2021, then continued along that path for eight months before eventually reversing position in June 2022.

To try to squeeze back into the *Metro Storage* framework, the defendants argue that they only delayed contending that Tatum had been terminated for cause so that they could conduct a thorough investigation. But the defendants have not identified

9

anything that they learned that might justify a change of position. The allegations of the counterclaims indicate that the defendants knew everything they needed to know in September 2021, when they accepted Tatum's departure and deemed it a resignation without good reason.

### III.    CONCLUSION

The after-acquired evidence doctrine prevents a faithless fiduciary from retaining the benefits flowing from his concealment and deception. It does not authorize an employer to learn about misconduct, make a business decision not to act on it, treat an employee as having resigned, accept the benefits of that mode of departure, then reverse course months later. The motion to dismiss Count IV of the counterclaims is granted.