# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| A&J CAPITAL, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 2018-0240-JRS** |
| | : | |
| LAW OFFICE OF KRUG, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| LA METROPOLIS CONDO I, LLC, | : | |
| a Delaware limited liability company, | : | |
| | : | |
| Nominal Defendant. | : | |

## MEMORANDUM OPINION

Date Submitted:  October 30, 2018
Date Decided:  January 29, 2019

Kurt M. Heyman, Esquire, Melissa N. Donimirski, Esquire and Elizabeth A. DeFelice, Esquire of Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware, Attorneys for Plaintiff.

Stephen B. Brauerman, Esquire and Sara E. Bussiere, Esquire of Bayard, P.A., Wilmington, Delaware and Craig H. Marcus, Esquire of Glaser Weil Fink Howard Avchen & Shapiro LLP, Los Angeles, California, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

A dispute over the management of a Delaware limited liability company has sparked allegations of conspiracy, forged documents and perjured testimony. The company, nominal defendant, LA Metropolis Condo I, LLC ("LAMC" or the "Company"), was formed to raise investment capital under a federal government program whereby the government offers favorable immigration treatment in exchange for qualified foreign investments in new commercial enterprises in the United States. The members of the Company are two hundred Chinese nationals who collectively contributed $100 million to be invested in a construction loan for the development of residential and commercial space in downtown Los Angeles. The loan was extended to Greenland LA Metropolis Development I, LLC (including its affiliates, collectively, "Greenland"). The plaintiff, A&J Capital, Inc. ("A&J" or "Plaintiff"), was engaged to serve as Class B Manager of the Company in exchange for a management fee. It is alleged that Greenland became displeased with A&J and then colluded with certain members of the Company to trump up reasons to have A&J removed as manager. That removal occurred in March 2018.

The Company's operating agreement and the management agreement by which A&J was engaged both provide that the Class B Manager may be removed only for "cause." In its complaint, A&J alleges that no such cause existed, that certain members were cajoled by Greenland into voting to remove A&J so that Greenland could extract concessions from the Company, and that defendant, Law

1

Office of Krug ("Krug" or "Defendant"), acted as the facilitator of the plot improperly to remove A&J and now occupies the role of Class B Manager without authority.

At least as to the management agreement, the "for cause" removal provision was a protection for which A&J bargained and gave consideration. "For cause" removal provisions are not aspirational, nor do they allow the principal to remove the agent on a whimsy and then manufacture "cause" after-the-fact to justify the removal. Nevertheless, the majority of the members of LAMC, influenced by Greenland and guided by Krug, apparently viewed their removal rights differently. As explained in this post-trial Memorandum Opinion, I am satisfied from the preponderance of the evidence that these members removed A&J without cause and then formulated after-the-fact explanations for removal that are neither credible nor adequate under the operative agreements to justify their actions. Accordingly, as requested, A&J is entitled to declarations pursuant to 6 *Del. C.* §§ 18-110 and 18-111 that it was improperly removed as Class B Manager and that it must be reinstated to that position immediately with all of its rights and obligations under the operative agreements restored.

## I. BACKGROUND

The Court held a two-day trial during which it received over 400 trial exhibits and heard live testimony from six witnesses. I have drawn the facts from the stipulations of fact entered in advance of trial, the testimony and exhibits presented during trial and from reasonable inferences that flow from that evidence.[1] To the extent I have relied upon evidence to which an objection was raised but not resolved at trial, I will explain the bases for my decision to admit that evidence before I discuss it.

### A. The Parties and Relevant Non-Parties

Plaintiff, A&J, is a financial services and advisory firm incorporated and based in California.[2] It is the designated Class B Manager of LAMC and also manages ten other companies that operate under the EB-5 Immigrant Investor Visa Program ("EB-5").[3] Qingfu "Frank" Xu is A&J's founder and President.[4] Alex

---

[1] Citations will be in the following format: "PTO ¶ __" shall refer to stipulated facts in the pre-trial order; "Trial Tr. __ ([Name])" shall refer to witness testimony from the trial transcript; "JX__" shall refer to trial exhibits using the JX-based page numbers generated for trial; "[Name] Dep. __" shall refer to witness testimony from a deposition transcript lodged with the Court for trial.

[2] PTO ¶ 1; Trial. Tr. 13 (Verba).

[3] PTO ¶ 8; Trial. Tr. 19 (Verba). As explained below, EB-5 is the federal immigration program that prompted LAMC's creation and defined its purpose.

[4] PTO ¶ 8.

Verba is A&J's Senior Vice President and in charge of LAMC's day-to-day operations.[5]

Defendant, Krug, is a single-person, unincorporated law firm based in California that is operated by James Krug.[6] Krug was appointed as the interim Class B Manager following A&J's purported removal.[7]

Nominal Defendant, LAMC, is a Delaware LLC principally based in California that formed in April 2014 to raise immigrant investor capital under the EB-5 visa program.[8] As noted, the investment capital was used to provide a $100 million construction loan to Greenland for the development of the first phase of a multi-phase real estate project.[9]

Non-party, Greenland, is a Delaware LLC and an affiliate of one of the largest state-owned real estate developers in China.[10] Greenland was in charge of developing a 38-story residential tower in downtown Los Angeles (the "Project")

---

[5] Trial. Tr. 13, 90 (Verba), 236 (Xu).

[6] PTO ¶ 2.

[7] PTO ¶ 25.

[8] PTO ¶¶ 3, 4, 6.

[9] PTO ¶ 7.

[10] JX 12-0022.

4

and received the EB-5 construction loan from the Company to fund the development.[11]

Non-party, Henry Global Consulting Group ("Henry Global"), is a Chinese company that solicits investments for EB-5 projects and was responsible for securing investments in the Company.[12]  Henry Global is a strategic partner of A&J and is involved with each of the EB-5 companies managed by A&J.[13]  Henry Global's owner's sister is married to Mr. Xu, A&J's founder and President.[14]

## B. The Company and the Project

In 1990, Congress enacted EB-5 to permit foreign nationals to become lawful permanent residents of the United States (or "green card" holders) by making a threshold investment in a "new commercial enterprise" ("NCE") that creates or preserves at least ten jobs for U.S. workers.[15]  In addition to meeting numerous requirements imposed by EB-5 regulations, the foreign national must serve as limited partner of the NCE or as an investor in an entity that makes a loan to a NCE.[16]

---

[11] PTO ¶ 7; JX 12-0048.

[12] Trial Tr. 20 (Verba).

[13] PTO ¶ 8.

[14] *Id.*

[15] PTO ¶ 4.

[16] PTO ¶ 5.

The foreign national's investment must be maintained in the NCE and must remain "at risk" while the United States Citizenship and Immigration Service ("USCIS") processes the application for permanent residency, a process that can take as long as ten years.[17]

In late 2013, Mr. Xu was introduced to Ifei Chang, then-CEO of Greenland USA, to discuss an EB-5 investment in the Project.[18] When Ms. Chang expressed interest, Mr. Xu introduced her to A&J's strategic partner, Henry Global.[19] By late summer of 2014, Greenland, Henry Global and A&J had agreed to structure the EB-5 investment as a Delaware LLC that would extend a $100 million construction loan to Greenland with a 2.2% rate of return to mature after five years.[20] As Henry Global prepared to market the investment to Chinese citizens, Greenland named Home Paradise Investment Center, LLC ("Home Paradise") to be the "Regional Center"

---

[17] PTO ¶ 4. To comply with EB-5 regulations, the investors' capital must remain in a state where there is a risk of loss and potential for gain. *See* USCIS Policy Manual 0.2(A)(2), https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume6-PartG-Chapter2.html.

[18] Trial. Tr. 233 (Xu).

[19] *Id*.

[20] Trial Tr. 21–23 (Verba), 233 (Xu).

6

for the Project.[21]  It also named Urban Harmony, a wholly owned subsidiary of Home Paradise, as the Company's Class A Manager.[22]

## C. The Disclosure Document and Agreements

Four documents are particularly important in determining the validity of A&J's removal: the Private Placement Memorandum ("PPM") (a disclosure document from Greenland to potential investors),[23] the Operating Agreement (a contract between Urban Harmony and the investors),[24] the Management Agreement (a contract between the Company, A&J and the investors)[25] and the Distribution Services Agreement ("DSA") (a contract between the Company and Henry Global).[26]

---

[21] Trial Tr. 22 (Verba).  The Regional Center is in charge of the investment offering and assists investors in providing information to USCIS regarding the NCE's job creations and expenditures of funds so that USCIS can ensure compliance with EB-5 rules and regulations before processing the investors' residency petitions.  Trial Tr. 27 (Verba); JX12-0043.

[22] Trial Tr. 21 (Verba).  As explained below, the Class A Manager was to ensure compliance with immigration rules and regulations while the Class B Manager was to manage the day-to-day operations of the Company.

[23] JX 12.

[24] JX 10.

[25] JX 8.

[26] JX 16.

### 1. The PPM

On July 11, 2014, Henry Global and Home Paradise issued a PPM to prospective EB-5 investors that described the Project and the terms of the investment offering.[27] The PPM explains that upon payment of a $500,000 "Subscription Price" and a $45,000 "Administration Fee," each EB-5 investor will receive a "Class B Unit" and will become a "Class B Member of the Company" (a "Member").[28] By the terms of the offering, Class B Members together own 100% of the Class B membership interests in the Company.[29]

The $100 million loan funded by the Members' Subscription Price bears an interest rate of 2.2% with 1.8% payable in cash and 0.4% accrued annually.[30] The PPM discloses that Members can expect to receive 1.0% total interest on the loan (or 0.2% per year payable in five years at the loan's maturity date).[31] Given the low interest return, the PPM makes clear that the primary benefit of the Members' investment is participation in the EB-5 program and resulting reward of permanent

---

[27] JX 12.

[28] JX 12-0003–04. The Class A Manager, Urban Harmony, is the only Class A Member and holds one Class A Unit of the Company, which "entitles the Class A Member to no rights except for the right to vote on replacement of Managers." JX 10-0003.

[29] JX 12-0004.

[30] JX 12-0027.

[31] *Id*.

residency in the United States.[32]  In this regard, the PPM states that "the Loan may not be prepaid prior to the Maturity Date unless (i) all Class B Members receive final adjudication of their respective Form I-829 Petition . . . and (ii) no rights or economic interests of any Class B Member will otherwise be adversely affected."[33]

The PPM contemplates that a Class A Manager and Class B Manager will administer the Company.[34]  Although the PPM states that the Class B Manager will be elected by majority vote of the Class B Members, it presupposes that A&J will be appointed as Class B Manager and lists A&J's contact information.[35]  The PPM also advises investors that the Class A and Class B Managers may be removed only

---

[32] JX 12-0005 ("The Offering has been structured with the intent that each Class B Member, by subscribing for a Class B Unit and becoming a member of the Company, will have made an investment that qualifies as the investment component required for an I-526 Immigrant Petition by Alien Entrepreneur ("**I-526 Petition**") that entitles the Class B Member to seek permanent United States residency and, ultimately, to apply for U.S. citizenship . . . .") (emphasis in original); JX 12-0026 ("*Subscriber Investment Objective*: To provide financing for the Project in the form of a loan (*i.e.*, the Loan) to Developer in the form and manner allowing for an investment in the Company to be a "qualifying investment" under the EB-5 Program.") (emphasis in original).

[33] JX 12-0027.  The I-829 application shows that the NCE has created qualified jobs.  Trial Tr. 85 (Verba).

[34] JX 12-0002, 31.  In addition to Class A and Class B Managers, the PPM provides for the services of "oversea/offshore finders and agents to seek potential investors in the Company (each a "**Program Locator**") and document processors to process immigration paperwork and assist[] with their immigration paperwork for those investors (each, a "**Processor**") . . . ."  JX 12-0035 (emphasis in original).

[35] JX 12-0032–33.

9

"by majority vote of the Class B Members for gross negligence, intentional misconduct, fraud or deceit."[36]

As disclosed in the PPM, each person or entity that performs a role described in the PPM—Class A Manager, Class B Manager, Program Locator and Processor— is to be paid a fee for their services. The Class A Manger is to receive a management fee of $4,000 per Class B Member plus 0.1% per year of the outstanding loan balance.[37] The Class B Manger is to receive 0.4% per year of the outstanding loan amount.[38] There is no explicit fee disclosed for the Program Locator and Processor, but the PPM states "that the Company may pay a fee to compensate firms and individuals for those [Program Locator and Processor] services."[39]

The PPM also discloses the permitted and prohibited sources of payment for so-called Manager Fees:

> All of the Administration Fees are paid to Program Locators and Processors for capital raising and document processing and to the Class A Manager and Regional Center as payment for their fees . . . . None of such fees shall be paid out of the Subscription Price or investment in the Membership Interests of the Company.[40]

---

[36] JX 12-0032, 35.

[37] JX 12-0032.

[38] JX 12-0034.

[39] JX 12-0035.

[40] *Id*.

. . . .

The Company will pay out of the Administration Fee and interest income all ordinary administrative and operating expenses . . . as well as payments to Managers and other third party service providers for servicing the Loan, assisting with the Offering, and providing immigration services to the Company, Subscribers, and Class B Members.[41]

## 2. The Operating Agreement

As previewed in the PPM, the duties of the Class A and Class B Mangers are set forth in an Operating Agreement that became effective on the same day the PPM was issued.[42]   Under Section 5.3(d)(i) of the Operating Agreement, the Class A Manager is responsible for maintaining the Company's compliance with USCIS rules and regulations and communicating with USCIS about those matters.[43]   Under Section 5.3(d)(ii), the Class B Manager is responsible for the day-to-day administration of the Company, which includes, among other responsibilities, managing investment of Company funds, negotiating, amending and/or

---

[41] JX 12-0042.  The PPM also explicitly prohibits the Class A Manager's fee from being paid out of the Subscription Price (JX 12-0032 ("None of such fees will be paid from the Subscription Price, but may be paid from the Administration Fee paid by a Class B Member.")), and provides that the Class B Manager's fee will be "paid directly by the Company via interest proceeds"  (JX 12-0034).

[42] PTO ¶ 13; Trial Tr. 28, 60–61 (Verba).

[43] JX 10-0014.

supplementing the terms of any loans made by the Company and entering into any agreement deemed appropriate for any beneficial purpose of the Company.[44]

The appointment and removal of the Class B Manager is governed by Section 4.8 of the Operating Agreement, which provides:

> The Class B Members, by Majority Vote,[45] shall have the sole and exclusive right to approve or disapprove of the following . . . f) Subject to 5.3, appointment, reappointment and removal as applicable of any Manager.[46]

Section 5.3, in turn, permits the Class B Members to remove the Class A and Class B Managers only for "gross negligence, intentional misconduct, fraud or deceit, as more fully set forth in the Management Agreement."[47]

### 3. The Management Agreement

On or about the same day the Operating Agreement became effective, the Company, A&J and the Class B Members entered a Management Agreement that states more specifically the terms by which A&J would serve as the Class B Manager

---

[44] JX 10-0015.

[45] The Operating Agreement defines "Majority Vote" as "Class B Members who, at the time in question, have Percentage Interests aggregating more than fifty percent (50%) of all Percentage Interests held by all Class B Members." JX 10-0004.

[46] JX 10-0010–11.

[47] JX 10-0014.

of the Company.[48]  The Management Agreement reiterates previous disclosures that A&J would receive an annual management fee equal to 0.4% of the outstanding loan. Section 6(a) of the Management Agreement, however, provides that the Members and A&J may agree to modify A&J's compensation: "The Management Fee shall from time to time be reviewed and modified as may be mutually agreed upon by the Company and the Class B Manager, subject to any approval rights of the Members pursuant to Section 4.8 and 5.11 of the Operating Agreement."[49]

Section 12(b) of the Management Agreement repeats the removal standard stated in the PPM and Operating Agreement:

> The Class B Manager may be removed by Majority Vote (as defined in the Operating Agreement) of the Class B Members for gross negligence, intentional misconduct, fraud or deceit; provided that in any of such events as specified in this Section 12(b), without limiting any of their respective rights and remedies, the Members shall be

---

[48] PTO ¶ 15; Trial Tr. 28, 60–61 (Verba).  The Class B Members joined the Management Agreement by entering a Joinder Agreement executed on the same day they made their investment in the Company.  Trial Tr. 60–61 (Verba).  The Management Agreement defines "Joined Members" to be "[t]hose persons . . . who have joined as a party to this Agreement . . . by entering into a Joinder Agreement . . . and whose details are contained in each respective Joinder Agreement," and "Joinder Agreement" is defined as "the Joinder Agreement to this [Management] Agreement in the form as attached hereto."  JX 8-0002–03.

[49] JX 8-0006.  Section 4.8 of the Operating Agreement states that "each Class B Member may take part in the management of the Company by (a) exercising that Class B Member's voting rights as set forth in this Agreement . . . ."  JX 10-0010.  Section 5.11 of the Operating Agreement states that "Each Manager shall be entitled to remuneration for services provided to the Company and other benefits in accordance with the terms hereof and the Management Agreement, provided such agreement shall have been approved by the Members in accordance with Section 4.8 hereof . . . ."  JX 10-0019.

13

entitled to exercise their respective powers under the Operating Agreement to appoint a new Class B Manager and to cause the Company to issue written notice of termination to the Class B Manager hereunder.[50]

### 4. The DSA

In August 2014, the Company executed a Distributor Services Agreement that names Henry Global as a "Distributor" responsible for recruiting EB-5 investors from China.[51]  Under the DSA, Henry Global agrees to

> (i) comply with and/or assist EB-5 Investors with the compliance of information requests of all competent authorities regarding Distributor and/or EB-5 investors, (ii) liaise with and/or procure consents from EB-5 Investors in relation to the Project, and (iii) provide other reasonable incidental assistance to the Lender, Borrower or EB-5 Investors.[52]

In exchange for these services, the Company agrees to pay Henry Global $41,000 from the proceeds of each investor's Administration Fee, 1.3% of the outstanding loan amount on a calendar quarter basis and 1% of the outstanding loan amount at maturity.[53]

---

[50] JX 8-0010.

[51] JX 16.

[52] JX 16-0002.

[53] *Id.*  On November 9, 2015, the DSA was terminated (JX 23) and a new, substantially identical, DSA was executed with a different Henry Global entity (JX 24).

In sum, the agreements allocate the entities' and investors' shares of the 2.2% interest on the loan as follows: 0.2% per year to the Class B Members;[54] 0.4% per year to the Class B Manager;[55] 0.1% per year to the Class A Manager;[56] and 1.5% per year to Henry Global.[57] Under the same agreements, of the $45,000 Administration Fee, $4,000 is allocated to the Class A Manager[58] and $41,000 is allocated to Henry Global.[59]

### D. The Company's Financial Statements and the Resignation of the Class A Manager

The loan to Greenland was executed on August 28, 2014.[60] For each fiscal year of the loan, A&J directed an accounting firm to review the Company's unaudited financial statements.[61] From 2014 through 2016, A&J sent the written product of the accounting firm's reviews and the firm's notes to Henry Global for

---

[54] JX 12-0027.

[55] JX 12-0034, JX 8-0006.

[56] JX 12-0032.

[57] JX 16-0002.

[58] JX 12-0032.

[59] JX 16-0002.

[60] JX 14.

[61] Trial Tr. 43–44, 46 (Verba); JX 20, JX 32, JX 36.

dissemination to the Members.[62]  The balance sheet and statement of cash flows always included line item payments to Henry Global and a "related party."[63]  In addition to explaining that the "related party" is Urban Harmony, which receives a portion of the Administration Fee, the notes state that the Company is required to pay Henry Global "1.3% of the outstanding Note amount on a calendar quarter basis upon receipt of payment from the Developer and 1% of the outstanding Note amount during the term of the Note upon receipt of payment from the Developer at the Maturity . . . of the Note."[64]  Although Henry Global distributed copies of the financial statements to the Members per A&J's direction, it apparently did not distribute the pages of notes that referenced the payments to Henry Global.[65]

In September 2017, the U.S. Securities and Exchange Commission brought an enforcement action against the principal of Home Paradise, his wife and several

---

[62] Trial Tr. 46–47 (Verba).

[63] *See, e.g.*, JX 32-004, JX 32-0007.

[64] *See, e.g.*, JX 32-0011.

[65] Trial Tr. 297–303 (Wang).  Zhu Wang, one of two Members to appear at trial, testified that she did not receive the 2015 financial statements from Henry Global until 2017, but she did not suggest that statements for the remaining years were untimely.  Trial Tr. 297 (Wang).  She also testified that she did not receive pages eight and nine of the 2015 statements or page nine of the 2016 statements.  Trial Tr. 298–303 (Wang); *see also* JX 30, JX 38 (financial statements that Ms. Wang received from Henry Global).  Kangni Sun, the other Member to appear, similarly testified that she did not receive the last pages of the 2015 and 2016 financial statements.  Trial Tr. 337–38 (Sun); *see also* JX 31, JX 39 (financial statements that Ms. Sun received from Henry Global).

of the principal's companies, including Home Paradise.[66]  A&J notified the Class B Members of the suit and, soon after, Urban Harmony (a subsidiary of Home Paradise) resigned from its role as Class A Manager.[67]  A&J was concerned that the suit may also lead to Home Paradise's termination as the Regional Center.[68]  Fearing the potential negative impact of Home Paradise's separation from LAMC on the Members' pending immigration petitions, A&J sought to engage more directly with investors and provide assurances of their EB-5 status.[69]  As part of this effort, A&J sent the 2017 financial reviews with the attached notes directly to the Members instead of relying on Henry Global to distribute them.[70]  A&J did not receive any inquiries from the Members regarding the financial statements or the payments to Henry Global.[71]

---

[66] PTO ¶ 19.  The suit alleged that the couple had defrauded EB-5 investors in two projects unrelated to the Company or the Project.  *Id*.

[67] *Id*.  The Company did not name a replacement Class A Manager.  *Id*.

[68] Trial Tr. 47 (Verba).

[69] *Id*.

[70] Trial Tr. 46–47 (Verba); JX 224.

[71] Trial Tr. 50 (Verba), 315–316 (Wang), 357 (Sun).

17

## E. The Events Leading to A&J's Removal as Manager

Once the Project was substantially completed, funds from the sale of individual condominium units were released to an account in Greenland's name for the benefit of the Company (the "Pledge Account").[72] Greenland and the Company entered a pledge agreement to ensure that Greenland would not use the money in the Pledge Account without A&J's approval or for purposes other than those permitted by the loan agreement.[73] Greenland, however, considered the proceeds from the condominium sales to belong to it as borrower since it had not yet paid those funds to the Company.[74] It became frustrated over time that the sales proceeds were essentially locked up in escrow within the Pledge Account and that the funds could not be deployed either to pay down the loan or to advance other Greenland interests. To make matters worse from its perspective, Greenland had to pay interest to the Company on those funds since they were not being committed to pay down the loan.[75]

---

[72] Trial Tr. 64–65 (Verba).

[73] Trial Tr. 64 (Verba).

[74] Wu Dep. 34. Chao Wu is an Executive Vice President of Greenland U.S.A. and the General Manager of Greenland's Los Angeles and San Francisco Offices. *Id*. 12.

[75] Trial Tr. 65–66 (Verba).

Around May or June 2017, Greenland's CFO, Jian Zhang, approached Mr. Xu with an offer to repay the loan before its maturity date, with the implicit understanding that freed capital could be redeployed as a loan to fund another Greenland project.[76] Mr. Xu pointed out that the money in the Pledge Account, then $55 million, was growing quickly and could exceed the principal of the loan by the end of the year, meaning the Members' investment would no longer be "at risk" as required by EB-5 regulations.[77] Although the loan agreement explicitly prohibited prepayment, A&J and Greenland developed a prepayment plan to avoid the potential overflow of the Pledge Account.[78]

In September 2017, A&J provided the first drafts of amendments to the loan agreement, which noted that "Borrower has requested the right to prepay the Loan in accordance with certain conditions, as more fully set forth in the Note."[79] On October 19, 2017, Greenland provided counter-drafts that made certain changes but

---

[76] Trial Tr. 67 (Verba), 235 (Xu); Zhang Dep. 26, 40–41.

[77] Trial Tr. 67, 106 (Verba), 235 (Xu). The concern was that once Greenland had reserved enough funds to meet or exceed the principal amount of the loan, the loan could be deemed paid in full and the Members' investments could be deemed no longer "at risk."

[78] Trial Tr. 69 (Verba).

[79] JX 50-0003.

did not modify the "Borrower has requested . . ." language.[80] The Fourth Amendment to the Loan Agreement memorialized the final prepayment proposal.[81]

As part of the prepayment plan, A&J and Greenland negotiated a $1 million prepayment fee to A&J.[82] A&J believed it had engaged in substantial additional work prior to the negotiations for prepayment as a result of Greenland's repeated changes to the Project's budget and the process for draw requests.[83] A&J also maintained that additional compensation was warranted for its participation in prepayment negotiations and the pending redeployment process.[84] It estimated that redeployment could take up to two years and that, if prepayment occurred, it would forego $1.6 million in management fees that it would otherwise receive by the maturity of the loan.[85] Given that prepayment of the loan would allow Greenland to

---

[80] JX 53.

[81] JX 50.

[82] Trial Tr. 87 (Verba).

[83] *Id.*

[84] *Id.*

[85] Trial Tr. 69–73, 76–77, 86–87 (Verba). If the loan were prepaid four years before its maturity date, A&J would lose out on annual compensation of $400,000 per year or 0.4% multiplied by the outstanding loan amount. Trial Tr. 72–73 (Verba). A&J expected that it would take two to three months after the prepayment to identify a new investment opportunity, three to four months to negotiate the terms of the new loan, and 18 to 24 months to reach full deployment in the case of another construction loan. Trial Tr. 76–77 (Verba). A&J would not receive full compensation on the new loan until the full amount

keep $8 to $9 million in unpaid interest, Greenland agreed to pay A&J directly so that Members would be unaffected by the prepayment fee.[86] Of the $1 million fee, $200,000 would go to the Company.[87] The remaining $800,000 would go to A&J for:

> time and expense incurred to date in amending the Loan Documents, underwriting and negotiating closing documents in connection with the Senior Loan, research and analysis into matters including EB-5 Program Laws compliance and securities compliance for Lender investors in connection with prepayment of the Loan, and processing, underwriting, closing and administration of any replacement investment using prepaid amounts of Loan principal required by EB-5 Program Laws[.][88]

A&J advised the Members of the prepayment proposal in a memorandum dated October 26, 2017, which explained that prepayment was necessary to "cure [a] potential immigration violation" and "salvage the immigration status of most if not all of the Class B Members."[89] The following day, A&J presented the proposed plan for the Members' approval with a Notice to Class B Members and Request for

---

of the loan was disbursed. Trial Tr. 78 (Verba). Thus, A&J concluded that repayment of the loan would likely set back its compensation for at least two years.

[86] Trial Tr. 65–66 (Verba), 235 (Xu); Zhang Dep. 56.

[87] JX 50-0023–24.

[88] *Id.*

[89] JX 54.

Consent to Prepayment (the "Prepayment Notice").[90] The Prepayment Notice explained that A&J requested $800,000 *from Greenland* (not the Members) "for services rendered in connection with the Prepayment, including, without limitation:

- Negotiating with the Borrower the terms of the Fourth Loan Amendment;
- Negotiating prior amendments to the Loan Agreement and other ancillary documentation related thereto;
- Negotiating inter-creditor terms with the secured lender;
- Preparing documentation and conducting research with respect to preserving the collateral securing the Loan for the benefit of the Class B Members;
- Assisting developer to organize the construction supporting documents and related costs categories to comply with the regulation requirements of USCIS and US security laws;
- Coordinating execution of legal documents related to the Company;
- Continued oversight of the Company and investment management during the interim period between repayment of the loan; and
- Identifying opportunities for redeployment of capital."[91]

The Prepayment Notice does not address the anticipated length of time required for redeployment of the Company's capital or the $1.6 million in lost management fees as a basis to justify the prepayment fee. In addition to explaining the terms of the prepayment plan, the Prepayment Notice solicited the Members' approval and disclosed that A&J would consider a Member's abstention from voting as a vote in

_____

[90] JX 56.

[91] JX 56-0002.

favor of the prepayment plan.[92]  A&J hoped that this structure would expedite the implementation of the prepayment plan given the concern that the Pledge Account would soon exceed the Members' investments.[93]

Before the voting deadline of November 30, 2017, Greenland became concerned that A&J would not commit the redeployed investment funds to Greenland on favorable terms once the original loan was repaid.[94]  With these concerns in mind, Greenland's support for the prepayment plan evaporated.  Without A&J's knowledge, Greenland contacted certain Members of the Company directly and advised them that A&J was pushing for prepayment of the loan while Greenland opposed it.[95]  Ultimately, 135 Members returned votes rejecting the proposed prepayment.[96]  Of those 135 Members, ten are employees of Greenland or have family members who are employees of Greenland.[97]  And, as among the 135 no

---

[92] JX 56-0004.

[93] Trial Tr. 106 (Verba).

[94] Wu Dep. 85.  Mr. Wu testified that he believed A&J sought repayment to then negotiate an increased interest rate on subsequent projects financed by the reinvested money.  *Id.*

[95] Wu Dep. 44–45, 85; JX 106, JX 107, JX 116–17; Trial Tr. 109 (Verba).

[96] JX 280.

[97] Pl.'s Post-Trial Opening Br. ("POB") (D.I. 169), Ex. 1 (D.I. 170) (Revised Demonstrative 2).

votes, emails transmitting 102 of those votes were copied to Liming Wang, the husband of Member Zhu Wang.[98]

On November 20, 2017, Krug, who had previously been retained by certain Members to perform an analysis of the at-risk nature of the Pledge Account funds,[99] sent two demand letters to A&J opposing the prepayment plan and requesting a list of Members.[100] Neither letter mentioned the prepayment fee. The Company rejected Krug's demand for the Member list and neither Krug nor any Member elected to pursue an action to enforce inspection rights.[101]

---

[98] Trial Tr. 469 (Krug); JX 278–80. Zhu Wang testified that the email address ldgytwh@qq.com does not belong to her husband, but she could not recall his email address. Trial Tr. 319, 324 (Wang). Ms. Sun, whose husband is the director of technology for Greenland, testified during deposition that the email did belong to Liming Wang but recanted that testimony during trial. Trial Tr. 351–52 (Sun); Sun Dep. 37–38. Neither Zhu Wang nor Ms. Sun proved to be credible trial witnesses, as revealed in their demeanor and the substance of their testimony, and this is but one illustration of testimony that simply was not believable. A&J has moved to strike the Zhu Wang and Sun trial testimony as patently false and the product of improper witness coaching. POB 29 n.16. That motion is denied. As for the substantive question of whether Liming Wang was copied on the transmittal emails at issue, the credible evidence reveals that he was. From that evidence, I am satisfied that Liming Wang facilitated if not encouraged the vast majority of the no votes from Members on the prepayment proposal.

[99] Trial Tr. 435 (Krug).

[100] JX 74, JX 75.

[101] JX 93; Krug Dep. 63.

## F. Krug Purports to Remove and Replace A&J on Behalf of the Members

On December 8, 2017, after the prepayment plan had been rejected, A&J and Henry Global held a meeting in Beijing with the Members.[102] The attendees did not discuss the prepayment fee, but they did discuss concerns regarding the resignation of Urban Harmony as well as prepayment of the loan and redeployment of the Members' investment.[103] Notwithstanding the evidence that Greenland had initiated the prepayment discussions, one attendee—Liming Wang—complained that A&J had requested prepayment of the loan (apparently to advance its own interests) and criticized the structure of the vote on the prepayment plan.[104] After the meeting, Greenland contacted A&J and the two agreed to recommend a new proposal that would allow Greenland to cash out $55 million of its equity, thereby reducing the collateral of the loan and providing funds that Greenland could freely use for other projects.[105] The new proposal did not include a prepayment fee.[106]

---

[102] Trial Tr. 110 (Verba). Greenland did not attend the meeting. *Id.*

[103] Trial Tr. 110–11 (Verba).

[104] Trial Tr. 113–14 (Verba).

[105] Trial Tr. 116 (Verba).

[106] Trial Tr. 117 (Verba).

A&J notified the Members of the new proposal and structured the vote so that only votes in favor of the plan counted as affirmative votes.[107] Roughly a dozen Members delivered votes opposing the new proposal, but during the voting period, 91 Members emailed the Company asking A&J to cancel the vote and release $15.08 million to Greenland unconditionally.[108] Of these emails, 75 were copied to Liming Wang.[109]

On or about February 26, 2018, Krug drafted a Notice to Class B Members and Request for Vote and a Notice of Election (the "Removal Ballot").[110] The Members were asked to vote on the following proposals: "Remove A&J Capital Investment, Inc. as the Class B Manger? Yes. No." and "Elect Law Office of Krug as the interim Class B Manager? Yes. No."[111] The Removal Ballot did not identify a basis for removal, either in any prefatory statement or in the solicitation, but it did note the Members' rights to remove the Class B Manager under Sections 5.3(c)(ii) and 12 of the Operating and Management Agreements, respectively.[112] The

---

[107] Trial Tr. 116–17 (Verba).

[108] Trial Tr. 117–18 (Verba).

[109] JX 278–80.

[110] Trial Tr. 467–68 (Krug); Krug Dep. 126–27.

[111] *See, e.g.*, JX 321.

[112] *Id.*

26

Removal Ballot also instructed Members to return their votes via email to Krug and to copy Liming Wang.[113] Krug sent the Removal Ballot to Liming Wang, who, as liaison between the Members and Krug, forwarded the ballots to Members.[114] Krug received 105 emails with votes to remove A&J and appoint the Law Office of Krug as interim manager.[115] Of the 105 Members who voted to remove A&J, 11 are employees of Greenland or have family members who are employed by Greenland.[116]

On March 14, 2018, A&J received written notice that it had been removed as Class B Manager and replaced by Krug (the "Removal Notice").[117] The Removal Notice specifically states that "[a] majority of the Class B members have, in writing, voted to remove A & J [] as the Class B Manager," but it does not identify a basis

---

[113] *Id.*

[114] Trial Tr. 455, 471, 474 (Krug). Liming Wang did not appear for trial and it is not clear from other evidence the extent to which he had direct communications with Members regarding the Removal Ballot. It is unfortunate that Mr. Wang's testimony was not presented to the Court given his critical role in transmitting Removal Ballots to and from Members and his apparently close association with Krug, a party to the case.

[115] Trial Tr. 471–72 (Krug). As explained below, A&J presented the testimony of a document authentication expert to raise questions regarding the authenticity of several of the Removal Ballots, some of which, on their face, appeared either to be altered or to contain signatures copied and pasted from other documents.

[116] POB, Ex. 1.

[117] JX 141.

for removal or the details of the Class B Member vote effectuating the removal.[118]

Two weeks after sending the Removal Notice to A&J, and again on April 2 and April 3, 2018, Krug sent notices confirming the results of the removal vote to the email addresses from which Krug had received votes in favor of removing A&J.[119] He did not receive any replies questioning the results or his notices.[120]

## G. Procedural History

On April 3, 2018, A&J filed its Verified Complaint for Injunctive Relief pursuant to Sections 18-110 and 18-111 of the Delaware Limited Liability Company Act seeking a declaration that A&J was improperly removed as Class B Manager of the Company.[121] A&J simultaneously filed a Motion for Order to Maintain Status Quo and a Motion for Expedited Proceedings. After two hearings, the Court entered a status quo order on May 9, 2018, providing that A&J would remain as Manager pending resolution of the action.[122] On May 2, 2018, Krug filed its Answer and Counterclaims. The following day, A&J moved for summary judgment on the grounds that the Members were required as a matter of law to provide A&J with

---

[118] *Id.*

[119] Trial Tr. 475–79 (Krug); JX 174, JX 200, JX 206.

[120] Trial Tr. 475–79 (Krug).

[121] 6 *Del. C.* §§ 18-110 and 18-111.

[122] D.I. 29.

notice of their intent to remove the Class B Manager prior to the Member vote, an explanation of the grounds for removal and an opportunity to respond to the notice. On July 18, 2018, after oral argument, the Court denied summary judgment upon holding that neither Delaware law nor the Company's agreements require pre-removal notice.[123] Expedited discovery followed. Trial proceedings concluded on October 30, 2018, and the matter was submitted for decision that day.

## II. ANALYSIS

A&J initiated this action under 6 *Del. C.* § 18-110, which provides, in part:

> Upon application of any member or manager, the Court of Chancery may hear and determine the validity of any . . . election, appointment, removal . . . of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company, and, in case the right to serve as a manager is claimed by more than 1 person, may determine the person or persons entitled to serve as managers; and to that end make such order or decree in any such case as may be just and proper.

A&J seeks a declaration that its removal by an improper and unsubstantiated vote and its replacement as Class B Manager by Krug are invalid. In response, Krug asks the Court to declare that Krug was properly and effectively appointed Class B Manager and that A&J has no authority to continue to act in that capacity. Krug

---

[123] D.I. 110.

29

further requests that A&J immediately tender possession and control of all the Company's assets, property, documents, books, records and accounts to Krug.[124]

## A. The Authenticity of the Ballots

The parties devoted significant briefing and oral argument to A&J's challenge regarding the authenticity of the Removal Ballots (and, by extension, the legitimacy of the underlying votes). To be sure, the process by which removal purportedly occurred leaves much to the imagination. The Removal Ballot does not provide any basis for removal, or even state that removal is for cause as defined in the operative agreements. Nor does it provide for Members to indicate their physical address or any other means of identification beyond a signature line. Since Krug relied on Liming Wang to transmit the Removal Ballot to the Members, and Liming Wang did not testify at trial, the Court has no basis to discern how the Removal Ballots were distributed, what, if anything, the Members were told about the bases for removal or even whether the Members were asked to remove A&J for cause. The testimony of Zhu Wang and Ms. Sun fell far short of filling these information gaps.[125]

---

[124] In its Answer and Counterclaim, Krug cited Sections 18-100 and 18-111, but I assume this was a scrivener's error. Def.'s Answer and Countercl. ¶ 1.

[125] Ms. Sun testified that Liming Wang did not tell her anything about the reasons for removing A&J and that she did not receive any documents explaining the reasons. Trial Tr. 356 (Sun). Neither Zhu Wang nor Ms. Sun recalled whether they forwarded the

The parties debate whether the signatures on several of the Removal Ballots are real and to whom they belong.[126] A&J alleges that at least 25 email addresses used to send Ballots to Krug and 22 signatures on the Removal Ballots do not match addresses and signatures in Company records. Other Removal Ballots contain exact copies of signatures from other known documents, suggesting that someone copied and pasted the signatures onto the Removal Ballots.[127] Casting a shadow over all of this is A&J's allegation that Greenland, supported by a block of Members who are Greenland employees or related to Greenland employees, improperly influenced the removal vote.

Although much ink has been spilled and much breath has been expelled to proffer and debunk A&J's forgery and conspiracy evidence, I need not go down that craggy path to resolve this dispute. If Krug cannot establish that cause for removal existed, including whether Members knew the cause for removal at the time they cast their votes, then the process by which removal occurred, and the question of

---

Removal Ballot to other Members or discussed the reasons for removal with other Members. Trial Tr. 322–23 (Wang), 356 (Sun).

[126] As explained below, the validity of A&J's removal turns on facts other than the authenticity of the Removal Ballots. Accordingly, I do not rely on the testimony of Plaintiff's handwriting expert, Ruth Brayer, and I deny Plaintiff's Motion *in Limine* to Exclude Challenged Ballots and Defendant's Motion *in Limine* to Preclude Testimony of Brayer as moot. *See* D.I. 112 and D.I. 115.

[127] *See* JX 321, JX 322.

whether the Ballots are authentic and valid, are irrelevant.[128] For reasons explained below, I find by a preponderance of evidence that Krug's supposed bases to remove A&J do not rise to the standards for removal set by the Operating and Management Agreements. Accordingly, I decline to address the claims of forgery or collusion between certain Members and Greenland, and also decline to decide whether the

---

[128] At the conclusion of oral argument on A&J's motion for summary judgment, I explained that while Krug could supplement his for-cause basis for removal with additional evidence or causes for termination discovered after removal, he still was obliged to demonstrate that A&J had engaged in conduct, or failed to engage in conduct, at the time of removal that would satisfy the standards for removal as laid out in the operative agreements. *See A&J Capital, Inc. v. Law Office of Krug*, C.A. No. 2018-0240-JRS, at 44 (Del. Ch. July 18, 2018) (TRANSCRIPT). Stated differently, Krug cannot justify removal by searching for grounds after-the-fact. In *Davenport Group MG, L.P. v. Strategic Investment Partners, Inc.*, then-Vice Chancellor Steele held that post-termination evidence of cause for removal is not *per se* irrelevant in an action challenging the removal of a general partner. *Davenport*, 685 A.2d 715, 723 (Del. Ch. Jan. 23, 1996). Drawing from principles that have emerged in our employment law in the context of wrongful termination, the court noted that an employer is not barred from introducing evidence it discovers post-termination when defending a claim of wrongful termination. *Id.* These cases do not hold, however, that the employer may escape liability for wrongful termination (in a for cause termination case) even though it did not possess cause at the time of termination and instead relies only upon after-acquired evidence to justify its actions. *See, e.g.*, *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 358 (1995) ("It would not accord with this scheme [of the ADEA] if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation of the Act."). When taken out of context, the wording in *Davenport* that "'After-acquired' but factually undisputed information alone may support the removal of the General Partner" could be construed to support Defendant's effort to defend A&J's removal only with grounds that were discovered after removal. *Davenport*, 685 A.2d at 723. But a holding that would allow removal for any reason unearthed after the fact of removal would circumvent the for-cause contractual predicate for which A&J bargained. And it would deny the Members of the opportunity meaningfully to participate in the removal process because, by definition, their removal votes would not have been informed by the after-acquired evidence.

haphazard means by which Krug solicited the removal votes nullifies the results of the vote.[129]

## B. The Standards for Removal

Under the unambiguous terms of the Operating and Management Agreements, A&J can be removed only for cause, which the agreements define as "gross negligence, intentional misconduct, fraud or deceit."[130] Proving any one of these predicates for removal is no easy task.

"In the civil context, the Delaware Supreme Court has defined gross negligence as 'a higher level of negligence representing an extreme departure from the ordinary standard of care.'"[131] "It refers to a decision 'so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion.'"[132] Stated

---

[129] Although I have elected not to tackle these issues, I note that much of the dust that has been kicked up in this dispute would have remained settled had only Krug designed a system to solicit votes that allowed for more transparency and accountability. Going forward, the parties would be wise to learn from this unfortunate experience and to incorporate more formality and precision in their dealings with one another and with Members.

[130] JX 10-0014, JX 8-0010. *See Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992) ("When the language of a . . . contract is clear and unequivocal, a party will be bound by its plain meaning . . . .").

[131] *In re Synutra Int'l, Inc.*, 2018 WL 705702, at *5 (Del. Ch. Feb. 2, 2018) (ORDER) (quoting *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1999)).

[132] *Id.* (quoting *Solash v. Telex Corp.*, 1988 WL 3587 at *9 (Del. Ch. Jan. 19, 1988)).

33

differently, "[t]o establish gross negligence, a plaintiff must plead and prove that the defendant was 'recklessly uninformed' or acted 'outside the bounds of reason.'"[133]

Our law sets the mark to prove intentional misconduct so that it is similarly difficult to strike. "The duty to refrain from intentional misconduct is . . . essentially a subset of or another name for, the duty to act in good faith, where the focus is on whether the defendant (1) acted intentionally to harm those to whom he owes the duty or (2) intentionally or consciously ignored his duties, thereby causing harm to those to whom he owes the duty to refrain from intentional misconduct."[134]

Lastly, "'fraud' is defined as 'an intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right.'"[135] To prove fraud, a plaintiff must demonstrate five elements: (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable

---

[133] *Id.* (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005)).

[134] *Dawson v. Pittco Capital P'rs, L.P.*, 2012 WL 1564805, at *28 n.303 (Del. Ch. Apr. 30, 2012).

[135] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n.16 (Del. 1993) (quoting Black's Law Dictionary 337 (5th ed. 1983)).

reliance upon the representation; and (5) damage as a result of such reliance.[136] At common law, "fraud" and "deceit" are interchangeable.[137]

Krug argues that the for cause standards set forth in the operative agreements define standards of conduct only and, therefore, if A&J engaged in conduct that violated any of the standards, then it may be removed as Class B Manager even if that conduct was not undertaken for a purpose of causing, or did not cause, harm to the Company or its Members. I disagree. First, the operative agreements do not state that the Class B Manager may be removed for grossly negligent or fraudulent *conduct*; they state, instead, that removal will be justified, among other reasons, for "gross negligence" or "fraud." Second, and more to the point, the contractually imposed standards of conduct necessarily incorporate an appreciation that the proscribed conduct must either be harmful or cause harm to justify removal. If there is no risk of harm to the Company as a result of the Manager's actions, then there can be no deviation from the standards of care or conduct contemplated by the definitions of gross negligence, intentional misconduct, fraud or deceit.[138] Third,

---

[136] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983).

[137] *Id.*; *see also Nye Odorless Incinerator Corp. v. Felton*, 162 A. 504, 510 (Del. Super. 1931).

[138] *Accord*, *Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018) (holding that Delaware negligence law incorporates the notion of a foreseeable risk of harm directly into the determination of whether a defendant owed a duty (as a matter of law) to

Krug has not cited any case in support of his construction of the contractual removal standards that would justify divorcing the proscribed conduct from anticipated or actual harm caused by the conduct and he does not appear to disagree that the parties likely incorporated the elements of the standards as commonly known in our law.[139] And finally, even if harm (foreseeable or actual) were divorced from the contractual standards as Krug would have it, as explained below, the preponderance of evidence does not support the contention that A&J violated any of the standards of conduct in connection with any of the alleged grounds for removal.

## C. The Preponderance of Evidence Does Not Support Removal for Cause

Krug points to two series of actions undertaken by A&J that justified its removal for cause: (i) A&J's request for the prepayment fee as part of the prepayment of the loan coupled with the manner by which A&J structured the vote for approval of the prepayment plan (by stating that abstention would be deemed as approval); and (ii) the payments authorized by A&J and made to Henry Global. Krug does not clearly tie these events to any one or more of the particular standards

---

the plaintiff as opposed to reserving the foreseeability inquiry for the proximate causation determination).

[139] *See, e.g.*, Def.'s Opening Post-Trial Br. ("DOB") 10 (D.I. 168) ("None of these standards [for gross negligence, intentional misconduct, fraud or deceit] are explicitly defined in the applicable agreements, but they are well-known under Delaware law."); *A&J Capital, Inc. v. Law Office of Krug*, C.A. No. 2018-0240-JRS, at 94 (Del. Ch. Oct. 30, 2018) (TRANSCRIPT) ("[G]ross negligence is what case law defines as gross negligence. It's the common understanding of it.").

for removal as stated in the operative agreements but rather contends in general terms that the identified conduct violates all of the standards.[140]  He does suggest, however, that if each act standing alone is not enough to establish cause, then together they represent misconduct that more than justifies removal.[141]  For reasons explained below, here again, I disagree.

### 1. A&J's Request for the Prepayment Fee and Structure of the Prepayment Approval Vote Did Not Provide Cause for Removal

Krug characterizes A&J's request for a prepayment fee as an "attempt to steal a substantial amount of money from the Members, under false pretenses . . . ."[142]  I reject that claim summarily as nothing more than litigation hyperbole.[143]  In

---

[140] *See, e.g.*, DOB 11 (asserting generally that A&J's attempt to steal from the Members under false pretenses and paying funds to Henry Global while concealing them from Members exceeds the gross negligence standard); DOB 24 (offering A&J's failure to include additional reasons for prepayment in the Prepayment Notice as "another example of A&J's deceit"); DOB 29 ("Purposefully misleading the Members to obtain additional, unearned compensation constitutes gross negligence, intentional misconduct, fraud, and deceit."); DOB 30 ("A&J's wrongful manipulation of the voting process constitutes independent 'gross negligence' and 'intentional misconduct' . . . and demonstrates A&J's ill intent . . . ."); DOB 43 (offering the conclusion, without analysis, that payments to Henry Global constituted gross negligence and intentional misconduct).

[141] *A&J Capital*, C.A. No. 2018-0240-JRS, at 88–89, 103; DOB 53, 65 ("The totality of A&J's wrongdoing mandates removal.").

[142] Def.'s Opening Pre-Trial Br. 11 (D.I. 133).

[143] At the risk of engaging in a superfluous exercise in semantics, the evidence came nowhere close to proving (by any evidentiary standard) the crime of theft. *See Parker v. State*, 2019 WL 180172, at *2 (Del. Jan. 14, 2019) (quoting 11 *Del. C*. § 841 and explaining that theft is the taking of the property of another without consent and with the intent to deprive that person of it or to appropriate it).  Not only was the prepayment fee to come directly from Greenland (who had consented to the fee), the solicitation of approval for the

addition to his allegation of attempted theft, Krug claims that three aspects of the prepayment fee reveal A&J's fraudulent intent and, together, establish cause for removal. These arguments merit further consideration.

First, Krug argues that A&J knowingly lied when it advised Members that the prepayment fee was for "services rendered in connection with the Prepayment."[144] Krug asserts that each service listed as justification for the fee is unrelated to the prepayment proposal or already required of A&J under the operative agreements in exchange for its management fee. For example, Krug alleges that the first service ("Negotiating with the Borrower the terms of the Fourth Loan Amendment") is already required under Section 5.3(d)(ii)(7) of the Operating Agreement, which mandates that A&J "Negotiate, amend and/or supplement the terms of any loans made or to be made by the Company to the Developer." Similarly, Section 5.14 of the Operating Agreement requires the Class B Manager to "operate the Company in a manner that is designed to comply with legal and policy requirements of the EB-5 Program, as advised by the Regional Center." Krug argues that this section

---

prepayment proposal and accompanying ballot explicitly gave Members "the right to consent or not consent to the Prepayment [including the fee], as more fully set forth in the Notice of Election . . . ." JX 56-0004. *See also* JX 56 (noting that the purpose of the Notice is to, in part, "request that the Class B Members consent to and authorize the Company to agree to the Prepayment and enter into the Fourth Loan Amendment . . . .").

[144] JX 56-0002.

encompasses the eighth service ("Identifying opportunities for redeployment of capital") identified in the Prepayment Notice as a basis for the prepayment fee.[145]

Second, Krug asserts that A&J's structuring of the vote so that a Member's silence counted as a vote in favor of prepayment reveals an intent to deceive Members into approving the prepayment fee.[146] This is so, according to Krug, even though the Prepayment Notice clearly disclosed how A&J intended to count the votes.

Lastly, in his post-trial answering brief, Krug argued for the first time that fraudulent intent could be inferred from A&J's decision to tie approval of the prepayment fee to approval of the prepayment plan. Specifically, Krug argues that if prepayment of the loan was necessary or at least beneficial to the Company given the potential harm from the overflowing Pledge Account, then A&J breached its

---

[145] Krug further argues that A&J completed the second service ("Negotiating prior amendments to the Loan Agreement") and the third service ("Negotiating inter-creditor terms with the secured lender") prior to discussion of the prepayment plan. Additionally, the fourth service ("Preparing documentation and conducting research with respect to preserving the collateral securing the Loan") was not necessary to the prepayment since collateral does not need to be preserved if the loan is being repaid. Lastly, the fifth service ("Assisting developer to organize the construction supporting documents . . .") and seventh service ("Continued oversight of the Company and investment management during the interim period between repayment of the Loan") must be performed regardless of the prepayment.

[146] *A&J Capital*, C.A. No. 2018-0240-JRS, at 87–88, 91–92.

obligation to act in the Members' best interests when it conditioned the avoidance of the harm on the approval of its prepayment fee.

After considering the evidence, I find that none of these actions, whether considered independently or in total, provided cause for removal. In each instance, Krug's arguments center on A&J's alleged deceit or intentional misconduct—A&J misled Members about the "true justifications" for the prepayment fee, attempted to sneak in approval of the fee with a counterintuitive voting structure and tied the prepayment and fee proposals together to force the Members' to approve its fee. Of course, an intent to deceive or harm cannot be drawn directly from the trial record because there is no evidence of either (despite extensive discovery). And the inference of deceit or intent to harm cannot be drawn circumstantially when it is clear that A&J unabashedly disclosed the reasons for the prepayment, the fact that it was seeking a prepayment fee and the reasons why it believed the fee was justified, and then made clear that it was up to the Members to decide whether to approve the prepayment proposal. The fact that the prepayment was Greenland's idea, not A&J's, and the fact that the Members ultimately voted to reject the prepayment proposal, further undermines the contention that A&J acted to deceive or harm the Members.

A&J's listed justifications provided Members with the opportunity and information necessary to determine whether A&J deserved a prepayment fee.[147] Even if A&J peppered its stated justifications for the fee with services that the Operating and Management agreements already required it to perform, a premise not well-supported in the evidence, there is no evidence that it did so to dupe or otherwise harm the Members.[148] In fact, the Members may have been more likely to approve the prepayment had A&J included the "true justifications" that Krug argues A&J intentionally concealed. For example, it is likely that Members would have found A&J's request for an $800,000 prepayment fee to be justified had they known that A&J would forego $1.6 million in expected management fees, with no source of recouping that compensation during the years required to redeploy the capital, if the prepayment proposal were approved. Additionally, A&J did not hide

---

[147] Although Verba did not "realize [A&J] needed authority . . . to ask members to approve a prepayment fee that's not coming from the members themselves," (Trial Tr. 105 (Verba)), he testified that "[A&J] certainly felt that . . . approval for such a fundamental change as this [prepayment plan] required a member vote." (Trial Tr. 102 (Verba)). *See also* Trial Tr. 249–50 (Xu) ("Q: A&J decided to keep $800,000 of that prepayment fee for itself? A: Well . . . it's our proposal, but have to be approved (sic) by the investors.").

[148] The record suggests that A&J believed the justifications clearly referred to previous, current and expected work related to the prepayment. Trial Tr. 103 (Verba) ("Q: What was the intent of this section? A: The intent was to . . . have Class B members approve additional compensation for the Class B manager in connection with the work that was done before the prepayment, the work that was done in connection with prepayment, and the work to be done in connection with prepayment and redeployment." Q: . . . Are all of the bullet points actually services rendered in connection with the prepayment? A: They're obviously not . . . .").

the ball when it included justifications like "Continued oversight of the Company and investment management during the interim period between repayment of the Loan; and Identifying opportunities for redeployment of capital." These services would be provided only if the Members approved the prepayment plan.

Ultimately, there is no evidence that A&J's justifications misled any of the Members. Even Krug acknowledged that it was "obvious" that most of the services A&J listed to support the prepayment fee were not associated with prepayment.[149] Ms. Wang testified that she determined not to support the prepayment plan in part because of the disclosures A&J provided in the prepayment proposal.[150] It seems that a majority of the Members did not disagree with Krug and Ms. Wang's assessments as they voted to reject all aspects of the prepayment plan including, of course, the prepayment fee. Given this evidence, I cannot find that A&J engaged in conduct that implicated any of the contractual bases for removal when it provided its justifications for the requested prepayment fee. It merely provided its reasons and then put the matter to the Members to either accept or reject.

The prepayment proposal also discloses the allegedly deceitful voting structure and that the prepayment plan is tied to the fee. The proposal explicitly

---

[149] Trial Tr. 443, 444, 448 (Krug).

[150] Trial Tr. 326–27 (Wang).

42

states, "If a Class B Member does not return his or her completed Notice of Election on or prior to the Deadline, the Class B Member will be deemed to have consented to the Prepayment."[151] It also clearly links the prepayment plan and the fee request: "Separate and apart from the Prepayment Amount, Borrower shall be required to pay a prepayment fee equal to $1,000,000, payable as follows . . . ."[152] In hindsight, perhaps A&J should have structured the vote differently or separated the prepayment proposal from the fee, but neither of these choices rises to gross negligence, bad faith, fraud or deceit when A&J informed the Members of the exact terms of the plan and the structure of the vote. If the Members disagreed with the structure of the plan, they had the right under the Prepayment Notice and the operative agreements to reject the plan and to solicit approval for their own initiates. Indeed, Members could have resolved to separate the prepayment plan and the prepayment fee if that was the course they wished to take.[153] That did not occur. In any event, given the origin and purpose of the prepayment plan, and A&J's full disclosure of the structure

---

[151] JX 56-0004.

[152] JX 56.

[153] While no Members sought to separate the prepayment fee from the prepayment plan, a group of Members, apparently urged on by Greenland, unsuccessfully sought Member approval of a plan that would have authorized Greenland to take a portion ($15.08 million) of the Pledge Account directly. Trial Tr. 118 (Verba) (estimating that A&J received about 90 votes requesting the release of $15.08 million to Greenland), 353 (Sun) ("Q: . . . And you sent an email to the company, or to A&J, requesting the release of $15.08 million to Greenland; correct? A: Yes.").

43

of the vote and the linkage between the prepayment plan and the prepayment fee, I do not find that either of these aspects of the prepayment plan implicated any of the contractual bases for removal.

## 2. The Payments to Henry Global Did Not Provide Cause for Removal

Krug's second proffered basis to remove A&J is that A&J caused the Company to make improper payments to Henry Global. Specifically, Krug claims that A&J wrongfully made payments in excess of Henry Global's allotted share of the Administration Fee under the PPM and concealed those payments from Members.

The PPM prohibits fees "paid out of the Subscription Price or investment in the Membership Interests of the Company."[154] The parties agree that the Subscription Price is the initial $500,000 investment made by each Member and that these investments cannot be used to pay third parties like Henry Global. It is the second prohibited source of fees—the "investment in the Membership Interests of the Company"—that forms the basis of Krug's allegation here. According to Krug, this phrase means that fees paid to Henry Global cannot come from the "investment income" generated by the Members' Subscription Price. For its part, A&J interprets "investments in the Membership Interests" to mean "a bundle of rights constituting

---

[154] JX 12-0040.

a Member's interest in the Company" made up of the Subscription Price plus any additional "Capital Contribution" made by the Members.[155] A&J reads the PPM as prohibiting the Class B Manager from paying fees out of the Subscription Price or any additional Capital Contributions, but allowing it to pay fees out of the interest income generated by the Members' investments in the loan.

Krug also argues that the payments to Henry Global are excessive. He points out that both the DSA and the PPM already require Henry Global to recruit EB-5 investors for the Company and to assist Members with immigration documentation and information requests.[156] Additionally, Krug maintains that Henry Global had previously entered into individual agreements with the Members that required Henry Global to provide the same immigration services as required by the PPM and DSA.

Finally, Krug argues that A&J intentionally prevented the Members from learning of the payments to Henry Global by concealing the DSA from the Members and distributing, through Henry Global, financial statements in English and without

---

[155] Section 3.2 of the Operating Agreement states that "[t]he Members may be permitted . . . to make additional Capital Contributions if the Mangers determine that such additional contributions are necessary or appropriate . . . [and] if such additional Capital Contributions are not to be made by all of the Members pro rata, the additional Capital Contributions and corresponding changes in the Membership Interests shall require the approval of the Members . . . ." JX 10-007.

[156] DOB 45 (citing JX 22 and JX 13).

the accounting firm's notes. According to Krug, this misconduct alone justified removal.

There can be no question that A&J was authorized to pay Henry Global for its services. Section 5.3(d)(ii)(10) of the Operating Agreement authorizes the Class B Manager to "[e]nter into any agreement which the Managers may reasonably deem appropriate for any purpose beneficial to the Company . . . ."[157] Krug has not pointed to any evidence suggesting that A&J considered the payments to Henry Global to be unreasonable and yet continued to make them. To the contrary, the credible evidence reveals that the payments to Henry Global are reasonable and that A&J believed them to be so.

Henry Global provides significant services in its role as Program Locator and Distributor. At the outset of its engagement, Henry Global was required to learn about the Project, organize conferences with potential investors to inform them of the Project, translate loan documents and raise capital.[158] As part of raising capital, Henry Global assisted investors with their application packages, traveled with the investors outside of China to open escrow accounts and assisted with currency transfers.[159] Once the investments were secured, Henry Global acted as a liaison to

---

[157] JX 10-0015.

[158] Trial Tr. 39 (Verba), 291 (Wang).

[159] Trial Tr. 39–40 (Verba).

46

the Company by communicating questions from the investors to the Company, coordinating votes and distributing documents.[160] Even now, Henry Global continues to assist Members with their citizenship application packages, including their Visa applications, and prepares them for their interviews with immigration officials.[161] In the event of redeployment, Henry Global will perform many if not most of these services again as it orients investors to the new project.[162]

The PPM recognizes that the Program Locator and Distributor are entitled to fees for their services, but it does not restrict the payments to a specific amount. Rather, the PPM restricts the sources of Henry Global's fees to the Administration Fees and interest income. Krug does not challenge that the fees paid to Henry Global come from those two sources. Nor does he challenge A&J's argument that the fees fit squarely within the interest income allocation scheme established in the PPM.

As noted, two provisions of the PPM disclosed that payments to Henry Global would be made from the interest income:

> All of the Administration Fees are paid to Program Locators and Processors for capital raising and document processing and to the Class A Manager and Regional Center as payment for their fees . . . .[163]

---

[160] Trial Tr. 40 (Verba), 290 (Wang).

[161] Trial Tr. 41 (Verba), 290 (Wang).

[162] *Id.*

[163] JX 12-0035.

. . . .

> The Company will pay out of the Administration Fee and interest income all ordinary administrative and operating expenses . . . as well as payments to Managers and other third party service providers for servicing the Loan, assisting with the Offering, and providing immigration services to the Company, Subscribers, and Class B Members.[164]

These provisions explain that "interest income" and the Members' $45,000 Administration Fee will be used to pay "ordinary administrative and operating expenses" as well as fees to third-party Program Locators, Processors, the Class A Manager and the Regional Center. The PPM also makes clear that none of the fees to these entities may be paid from the $500,000 Subscription Price or "investment in the Membership Interests of the Company."[165] "Membership Interest" is defined in the Operating Agreement to encompass the Class B Members' right to receive distributions from the Company, the right to vote or participate in management, the right to receive information and all other rights and obligations under the LLC Act.[166] "Investment in the Membership Interests," though not defined, appears to reference the Members' financial contributions to the Company in exchange for the bundle of rights captured within their Membership Interests. The only Member contributions

---

[164] JX 12-0042.

[165] JX 12-0035.

[166] JX 10-0005.

specified in the operative agreements are the Administration Fee, Subscription Price and any Capital Contributions. Indeed, the PPM states that "the Subscriber will have all the rights of a Class B Member" once the Subscriber has delivered the Subscription Price (also called a "Capital Contribution") and Administration Fee.[167]

What these provisions make clear is that Henry Global's fee cannot be paid from the Members' financial contributions to the Company, but the fees can be paid from "interest income," i.e., the interest on the loan comprised of the Members' investment in the Company. In arguing that the PPM prohibits fees to Henry Global paid from the Members' "investment income," Krug conflates "interest income" with the Members' investment. But, in accordance with the PPM, the Company pays Henry Global from the Administration Fee and interest income on the loan.[168] Nothing in the suite of agreements at issue here precludes A&J from paying Henry Global's fees from these sources.

Henry Global's share of the interest income fits with the PPM's allocation of the interest income to other parties. Under the PPM, the Class B Members can expect 0.2% of the interest,[169] the Class A Manager is entitled to 0.1% and the

---

[167] JX 12-0004.

[168] Trial Tr. 36, 38–39 (Verba).

[169] JX 12-0027. The PPM states that 1.8% of the 2.2% interest income will be payable in cash on a quarterly basis to the Company. *Id*. The remaining 0.4% will accrue annually and be payable at the maturity date. *Id*. "[F]rom the two percent (2.0%) so accrued and

Class B Manager is entitled to 0.4%.[170]  This allocation leaves 1.5% of the interest remaining and the DSA provides for Henry Global to receive 1.5%.[171]  And, of course, nothing in the operative agreements indicates that the Members are entitled to the remaining 1.5% interest income.  This makes sense given that the PPM emphasizes that the prevailing purpose of the EB-5 investment is to secure permanent residency in the United States.[172]  With the significant restrictions of the EB-5 regulations and the long horizon required to obtain citizenship under the program, it is clear that profit is not what motivated Members to invest.[173]

The evidence that Henry Global was compensated by each Member individually in addition to receiving payments from the Members' Administration Fees and interest income suggests that Henry Global was perhaps double dipping.[174]

---

payable at the Maturity Date [0.4% x five years], 1.0% [0.2% x five years] is expected to be payable by the Company to the Class B Members." *Id.*

[170] JX 12-0032, 12-0034.

[171] The DSA entitles Henry Global to 1.3% of the outstanding loan amount on a quarterly basis and 1% of the outstanding loan amount during the term of the loan (that is, the remaining 0.2% of the deferred 0.4% accrued annually over five years).  JX 16-0002; Trial Tr. 23 (Verba).

[172] JX 12-0005, 12-0026.

[173] *See* Sun Dep. 18 (testifying that she invested in the Company for immigration purposes and understood that her expected rate of return was "very little."); Wang Dep. 13–14 (testifying that she invested in the Company because it was part of the EB-5 requirements and would allow her to apply for citizenship status).

[174] Trial Tr. 292–94 (Wang) ("Q: And in addition to those documents [to make the $500,000 investment], you also entered into a personal agreement with Henry Global for

Even if true, Henry Global's excessive gain does not reveal wrongdoing on the part of A&J. Krug presented no evidence that A&J knew of the alleged agreements between individual Members and Henry Global.[175] Even assuming A&J's knowledge, and crediting Ms. Wang and Ms. Sun's testimony regarding the terms of their separate agreements with Henry Global, there is no contractual prohibition against Henry Global receiving revenue from multiple sources.

I am also not persuaded that A&J intentionally concealed the payments to Henry Global from the Members. The record suggests that A&J ordered an independent accounting firm to review the Company's financial statements including the Company's payments to Henry Global. A&J then provided those

---

Henry Global to provide services to you; correct? A: Yes, yes. That's the agreement, for them to provide any related immigration services. Q: Separate and apart from the $545,000 you paid for the investment, how much money did you pay to Henry Global for its immigration services? A: . . . it's somewhere between 50 and 60,000 [RMB] . . . Q: In exchange for the money that you paid Henry Global, did Henry Global agree to help you prepare immigration documents in relationship to the company? A: Correct. Q: Did Henry Global agree to assist you in processing those immigration documents with the government agencies in the United States? . . . A: Correct.").

[175] Krug submitted a copy of an individual agreement between Henry Global and a non-testifying Member but did not address it at trial or in briefing and did not suggest that the Company or A&J possessed or knew of the agreement. Trial Tr. 283–85. *See also* Trial Tr. 35 (Verba) ("Q: Do you know whether Henry Global has separate fee arrangements of their own with any of the investors for services? A: . . . All I know is the documents that we've signed with Henry Global as the agent . . . and I'm not really familiar with [the agreement between the investor and Henry Global], which is also in Chinese. And my Chinese is not too good. Q: So were you aware of any separate fee agreements prior to seeing that document? A: No.").

financial statements with the accounting firm's notes to Henry Global for distribution to the Members. Whether by accident or intentionally, Henry Global excluded the last page of the notes from the documents supplied to the Members. But I have found no credible evidence in the trial record that would suggest A&J had any part in concealing the payments to Henry Global, if they were, in fact, concealed.[176] A&J requested an independent review and provided the complete versions of the statements for distribution to Members. And when A&J determined that it was best for it to distribute the statements directly, it distributed them in their entirety.

After carefully reviewing the evidence, I am satisfied that Krug did not prove that the payments to Henry Global were unauthorized, prohibitively excessive or improperly hidden from the Members. Nor did he prove that the payments diminished the Members' expected investment returns. Accordingly, I cannot find that A&J engaged in gross negligence, intentional misconduct, fraud or deceit when it made payments to Henry Global under the DSA.

---

[176] Ms. Wang testified at trial that her vote to remove A&J was motivated in part by A&J's payments to Henry Global. Trial Tr. 316 (Wang). Thus, at least one Member saw enough in what was provided to her to prompt questions about the payments to Henry Global, even without the missing notes. At bottom, it does not matter whether the Members could determine whether and why Henry Global was overpaid. A&J provided them with the exact amounts owed to the third party each year and this evidence runs contrary to the notion that A&J acted with an intent to deceive.

52

### III. CONCLUSION

For the reasons stated above, I find for Plaintiff and will enter final declaratory judgment in its favor as requested in the Complaint. Plaintiff shall submit a conforming final judgment, upon notice as to form, within twenty days.